WISCONSIN PATIENTS COMPENSATION FUND, a State Agency, Plaintiff-Appellant,

v.

ST. MARY'S HOSPITAL OF MILWAUKEE, a Wisconsin Non-stock Corporation, Defendant-Respondent.†

Court of Appeals

No. 95–3294. Oral argument December 4, 1996.—Decided February 18, 1997.

(Also reported in 561 N.W.2d 797.)

†Petition to review denied.

For the plaintiff-appellant there were briefs by *Godfrey & Kahn, S.C.*, with *William H. Levit, Jr.*, *Michael B. Apfeld* and *Raymond J. Manista* of Milwaukee, and oral argument by *William H. Levit, Jr.*

For the defendant-respondent there were briefs by *O'Neil, Cannon & Homman, S.C.*, with *Thomas G. Cannon* and *Dean P. Laing* of Milwaukee, and oral argument by *Dean P. Laing*.

Before Fine, Schudson and Curley, JJ.

SCHUDSON, J. The Wisconsin Patients Compensation Fund (PCF) appeals from the trial court's summary judgment dismissing its action against St. Mary's Hospital of Milwaukee. PCF alleged that St. Mary's failed to comply with the requirements of § 655.23(3), STATS. (1983-84),[1] and, therefore, was not

---

[1] This decision cites and quotes the statutes applicable to the issues on appeal as they existed at the time. *See* Chapter 655, STATS. (1983-84). Subsequently, some have been revised and renumbered.

entitled to receive approximately $3.6 million in excess insurance payments for three claims PCF paid during the 1985-1986 period of alleged noncompliance. The trial court concluded that St. Mary's had complied with the statute and therefore was entitled to receive the PCF payments. Because we conclude that St. Mary's failed to comply, that PCF was not estopped from seeking recovery, and that PCF was entitled to restitution for its payments to St. Mary's, we reverse.

## I. LEGAL BACKGROUND

To analyze the issues in this appeal, it is necessary to understand the statutory relationship between the PCF and health care providers such as St. Mary's Hospital. Recently, the supreme court explained:

> The [PCF] was created by the legislature in 1975 in response to a perceived medical malpractice crisis. Concerned about what it viewed as the increasing cost and possible decreasing availability of health care in Wisconsin, the legislature promulgated a new system for processing medical malpractice claims.
>
> As part of this statutory scheme, the legislature established the [PCF] with the intention that it would finance a portion of the liability incurred by health care providers in medical malpractice actions. Health care providers are required to assume financial responsibility for a limited portion of any malpractice claim filed against them, either by purchasing liability insurance, self-insurance, or posting a cash or surety bond.
>
> Health care providers must also pay annual assessments to the [PCF]. From these assessments the [PCF] pays the portion of a successful claim against a health care provider in excess of either the amount of coverage mandated by the statute or the

coverage which a provider actually carries, whichever is greater.

*Wisconsin Patients Compensation Fund v. Wisconsin Health Care Liab. Ins. Plan*, 200 Wis. 2d 599, 607, 547 N.W.2d 578, 580-81 (1996) (footnote and statutory citations omitted).

Section 655.27(1), STATS., stated that the PCF is liable "only for payment of claims against health care providers . . . who have complied with this chapter," and § 655.23(5), STATS., limited a provider's primary malpractice liability by providing secondary PCF payments only "if the health care provider has met the requirements of this chapter." Thus, under the clear and unambiguous words of the statutes, if a provider complied with the requirements for participation in the PCF, it was entitled to receive secondary PCF insurance coverage; if a provider failed to comply, it was not entitled to PCF coverage.

As the supreme court noted, to comply with Chapter 655, STATS., a health care provider must, among other things, maintain primary malpractice liability coverage in one of three statutorily-specified ways. *Wisconsin Patients Compensation Fund*, 200 Wis. 2d at 607, 547 N.W.2d at 581. Section 655.23(3)(a), STATS., in part, provided:

> Every health care provider permanently practicing or operating in this state either shall insure and keep insured the provider's liability by a policy of insurance issued by an insurer authorized to do business in this state. . ., *shall qualify as a self-insurer*, or shall furnish to the commissioner a cash or surety bond in accordance with the requirements of this chapter. . . . The submission of a cash or surety bond, or *qualification as a self-insurer, shall*

*be subject to the approval of the commissioner and is valid only when approved by the commissioner.*

(Emphasis added.) In this case, the parties agree that if St. Mary's maintained primary malpractice insurance so as to qualify for secondary insurance through the PCF, it did so only as a self-insurer; the other two statutory options are not involved.[2] The principal issue therefore is whether St. Mary's "qualif[ied] as a self-insurer."

## II. FACTUAL BACKGROUND

The summary judgment submissions were voluminous, consisting of correspondence, affidavits, and numerous documents including the relevant insurance contracts. Distilled to its essence, the undisputed factual record established:

In 1983, St. Mary's applied to the Office of the Commissioner of Insurance (OCI) for approval of its self-insurance plan—a plan developed through its affiliation with the Daughters of Charity National Health System, Inc. (DCNHS), an organization providing insurance-related services to DCNHS member institutions.[3] The OCI rejected the St. Mary's self-insurance plan. According to Robert Luck, an OCI attorney who participated in reviewing the St. Mary's/DCNHS plan,

---

[2] In its brief to this court, St. Mary's seemed to be arguing, perhaps in the alternative, that it maintained "polic[ies] of insurance issued by . . . insurer[s] authorized to do business in this state," under § 655.23(3)(a), STATS. At oral argument, however, counsel for St. Mary's clarified that St. Mary's argument on appeal is that it qualified as a self-insurer, albeit in "hybrid" fronted forms with various insurance companies.

[3] The application and related documents refer to the Daughters of Charity Support Services, Inc. On appeal, however, both parties refer to DCNHS, as will we.

the OCI rejected the plan "because, among other things, the plan involved risk pooling among various hospitals within the DCNHS and would have constituted the unauthorized conduct of the business of insurance in violation of Wisconsin law."

Following the OCI's rejection of its self-insurance plan, St. Mary's, through its insurance agent, Marsh & McLennan, Inc., arranged for Aetna Casualty & Surety Company to "front" the St. Mary's/DCNHS self-insurance plan—i.e., to issue a primary liability policy under the Aetna name with coextensive deductible and coverage limits of $200,000 per claim and $600,000 per year, the applicable primary coverage amounts then required by Chapter 655, STATS. On June 21, 1983, Wayne Taylor, DCNHS Director of Risk Management, wrote a letter to the administrator of St. Mary's explaining that the Aetna "fronting" plan would "allow St. Mary's Hospital to participate in all the practical aspects of the [DCNHS] self-insured program along with the other hospitals in the system." The "effective result of all this," he further explained in his deposition, provided "self-insurance, as opposed to purchasing insurance on a first-dollar basis from an insurance company, where they ultimately assume all of the risk." Thus, in reality, the St. Mary's Aetna fronting policy established the DCNHS insurance arrangement the OCI had rejected. Aetna provided its name; the policy never referred to any involvement of DCNHS.

The St. Mary's/Aetna policy presented another problem. The deductible endorsement provided that Aetna "*may* pay any part or all of the deductible amount and, upon notification of the action taken, [St. Mary's] shall promptly reimburse [Aetna]" and "pay an additional premium" for each reimbursed claim.

23

(Emphasis added.) Thus the endorsement did not require Aetna to pay the deductible; the condition was optional and St. Mary's could avoid an additional premium if Aetna would not ever pay. This was an option, however, the OCI would not allow.

Approximately six months after the St. Mary's/Aetna policy was in effect, David Santi of Marsh & McLennan, in a meeting and through correspondence with OCI Attorney Luck, confirmed, in the words of Santi's February 16, 1984 letter, that fronting was a possible option "so long as the responsibility for the settlement and payment of claims remained with the carrier." Luck replied on March 14, 1984, reiterating that fronting was possible provided "an insurer settles and pays claims and the insurer later has recourse against the insured or other parties." Luck then wrote:

> A filing of this type will be reviewed by a number of individuals in this office. It is difficult to speculate on the precise policy terms. The best way to find out is to submit an active policy and then the office will go through the appropriate review process and consider approving the policy as required under the statutes.

Thus, at this point, the OCI had accepted the Aetna policy apparently not recognizing it as St. Mary's front for the previously-rejected DCNHS plan. Further, at this point, the OCI had indicated in general terms, without specific reference to any provider or policy, that a fronting policy might be acceptable, but (1) only if it would include claims settlement and payment provisions requiring the insurer responsibility to pay first; and (2) only if it would be reviewed for statutory compliance and approved by the OCI.

24

Having been advised of the OCI's requirements for fronting policies, Marsh & McLennan considered the possibility of having Aetna amend the deductible endorsement to comply. Aetna, however, declined to amend the endorsement and, instead, asked Santi to remove its name from the policy deductible endorsement and to submit this "sanitized" endorsement to the OCI for review. Instead, Santi submitted "a draft copy of such an endorsement" to the OCI without specific reference to any policy or provider, indicating that "[i]f approved, it would be our intent to submit the endorsement as part of an active policy to your office for the appropriate review process." The OCI, however, declined to approve. Luck wrote Santi on May 10, 1984:

> Basically, the Office does not preapprove such items as this. As was stated at our meeting with the Commissioner, the Office probably would not be adverse to this type of deductible arrangement as long as the insurer had primary obligation to pay with a later right to recover from the insured.
>
> Once you have finalized your arrangements, I would suggest that you submit it for approval for a particular provider. At that time, the Office would review it.

When Aetna did not renew St. Mary's fronting policy in 1984, St. Mary's obtained a comparable policy from St. Paul Fire & Casualty Insurance Company. Like the Aetna policy, the St. Paul policy merely fronted for St. Mary's DCNHS self-insurance. As James R. Gibson of Marsh & McClennan wrote to St. Paul on June 20, 1984, "Daughters of Charity Hospitals self-insure their General/Hospital Professional Liability coverage, therefore, the fronting carrier is not

25

intended to ever pay a claim in view of the deductible endorsement."

St. Paul sent the OCI a Certificate of Insurance for St. Mary's representing that the St. Paul policy satisfied the requirements of Chapter 655, STATS., and also sent Luck the policy for review. On July 3, 1984, Luck rejected the policy because, as he wrote Santi, "under the endorsement the insurer is not obligated to first pay the deductible." St. Paul then sent Luck a revised deductible endorsement requiring St. Paul to pay claims before seeking reimbursement. On October 29, 1984, Luck approved this revised deductible endorsement because "the insurer will pay the claims and then collect from the hospital."

What Luck could not know, however, was that following his July 3 rejection of the St. Paul policy, Marsh & McLennan and St. Paul not only submitted the revised deductible endorsement but also reached what they termed a "side agreement" relieving St. Paul of the obligation to pay anything under the policy. A series of memos and letters in July, August, and September 1984 confirming the side agreement culminated in a September 24, 1984 letter from Sister Julie Hanser, CEO of St. Mary's, to Paul Slegelis of St. Paul, stating in part: "As a member of the Daughters of Charity Health Systems, we self-insure our Comprehensive General/Hospital Professional Liability coverage under a Self-Insurance Trust Agreement and, therefore, it is not our intent that St. Paul should ever defend or pay a claim under this policy."

In short, this side agreement, in contrast to the revised St. Mary's/St. Paul policy approved by the OCI, restored the very conditions and practices the OCI had rejected. Neither St. Mary's, St. Paul, nor Marsh & McClennan ever informed the OCI of this side agree-

26

ment. They did not disclose that St. Mary's was utilizing a third party claims administrator hired by DCNHS to adjust and settle all claims. They did not reveal that St. Mary's had retained a law firm, unrelated to St. Paul, to defend claims. They did not inform the OCI that St. Mary's was paying its own claims through the DCNHS Trust.

St. Paul declined to renew its fronting policy for St. Mary's for July 1, 1985 to June 30, 1986. It did, however, agree to extend the policy until St. Mary's could obtain another insurer. Marsh & McClennan then secured a policy for St. Mary's with Hallmark Insurance Company. Like the Aetna and St. Paul policies, the Hallmark policy, effective October 1, 1985 through July 1, 1986, would merely front for St. Mary's self-insurance with DCNHS. As Seth Freudberg of Hallmark[4] stated in his affidavit:

> [I]t was my intent that Hallmark would not incur any expense as a result of issuing the Hallmark Policy. That is, Hallmark never intended to administrate or pay claims first and then seek reimbursement from St. Mary's or the Daughters. Instead, it was intended that St. Mary's or the Daughters simply would administrate and pay all claims and would not look to Hallmark for any payment or claims administration whatsoever.

Indeed, Freudberg explained, when Hallmark was sued for St. Mary's claims under Wisconsin's direct action statute, Hallmark tendered the claims to DCNHS and even was reimbursed for the "minimal

---

[4] When deposed in 1994, Freudberg was president of Hallmark; in 1985, he was vice-president of Hallmark and was directly involved in the negotiations with Marsh & McClennan of Hallmark's fronting policy for St. Mary's.

administrative expenses associated with tendering" the claims.

On August 30, 1985, however, Hallmark had submitted a blank policy form to the OCI for approval. The OCI did not approve the form and, on September 6, returned it to Hallmark because it did not contain a Certificate of Compliance. Freudberg then issued the Certificate and Hallmark re-submitted. The Certificate of Compliance stated, in part:

1. The accompanying form . . . complies with all applicable provisions of the Wisconsin Statutes and with all applicable rules of the Commissioner of Insurance; and

2.a. The form does not contain any inconsistent, ambiguous, or misleading clauses;

b. The form does not contain specifications or conditions that unreasonably or deceptively limit the risk purported to be assumed in the general coverage of the policy form;

Further, this form and Certificate were accompanied by a letter from Hallmark representing that the form was " 'Word for Word' already in use by the St. Paul Fire and Marine Insurance Company—a Licensed Insurer in the State of Wisc."

Effective September 15, 1985, OCI forms analyst David Bower approved the re-submitted Hallmark form. He did so, however, based on Hallmark's submissions, which did not identify any connection to St. Mary's or reveal any specific policy terms or side agreement. Further, the Hallmark policy included a deductible endorsement that included an option, equivalent to the one rejected by the OCI when Marsh & McClennan had submitted such an endorsement on behalf of St. Paul. The Hallmark endorsement stated:

28

"We [Hallmark] *can* pay the deductible to settle a claim. *If* we do, you [St. Mary's] agree to repay us" and to pay an additional premium for each claim. (Emphasis added.) Thus, even absent any side agreement, the Hallmark policy did not satisfy the OCI conditions for approval of a fronting policy.

During the St. Mary's/Hallmark policy period, Hallmark became concerned about possible legal repercussions of the fronting policy. Although, as Freudberg wrote to Santi on February 4, 1986, Hallmark had "no intentions of paying out any losses or expending any defense costs under this policy," at least one potential problem remained. Freudberg explained:

> The concern of the attorneys is that, if the entire structure of the Daughters of Charity organization somehow falls apart, (bankruptcy, or some other nightmare) there would be the possibility that, in desperation, the Daughters might begin to submit claims to this policy which in turn, would not respond under its present terms. If we were taken to court by the Daughters under the policy, the attorneys fear that the courts would reject the terms of the policy as unconscionable—how can premium be charged when no coverage is given.

St. Mary's considered obtaining a fronting policy from yet another insurer, or obtaining third-party insurance. Ultimately, however, it renewed with Hallmark for one year, effective July 1, 1986, but also provided Hallmark with an indemnity agreement and letter of credit from DCNHS satisfying Hallmark's concerns.[5]

---

[5] Freudberg stated that this "written indemnity agreement" was not executed until September 12, 1986, after the expiration of the 1985-86 policy period. He also explained, however, that he

29

Finally, effective July 1, 1987, after relying on fronting policies for four years, St. Mary's received OCI approval for self-insurance—not through DCNHS, but rather, through an independent self-insurance trust at a Wisconsin bank, under a policy by which risks would not be "pooled" with any other DCNHS hospitals.

In 1987 and 1988, in the course of reviewing St. Mary's self-insurance application and considering St. Mary's need to fund "tail" coverage for claims occurring before July 1, 1987, an OCI attorney who provided legal services to PCF concluded that the Aetna, St. Paul, and Hallmark policies, by virtue of their side agreements with St. Mary's, did not satisfy the insurer-pays-first condition the OCI had repeatedly specified as a condition for a fronting policy to be in compliance under Chapter 655, STATS. Subsequently, in the course of discovery during its litigation of this case, PCF also concluded that the Aetna, St. Paul, and Hallmark policies had simply fronted for the DCNHS self-insurance plan the OCI had rejected.

## III. TRIAL COURT DECISION

PCF sought declaratory judgment and restitution of $3,593,797.58, plus prejudgment interest, for the excess insurance payments it made between March 29, 1990 and April 2, 1991, for three medical malpractice claims filed against St. Mary's between July 1, 1985 and June 30, 1986—a period when, for the first three

---

requested the written agreement from DCNHS on February 4, 1986 and, as noted above, regardless of this written agreement, Hallmark and St. Mary's had agreed that Hallmark would never administer or pay any St. Mary's claims. Confirming the terms of the 1986-1987 policy, Marsh & McClennan wrote DCNHS reiterating that "it has never been the hospital's intent that Hallmark should pay anything."

months, St. Mary's was insured under the St. Paul policy and, for the final nine months, under the Hallmark policy. PCF claimed, in part, that it paid "under the mistaken belief that St. Mary's had procured liability insurance which complied with Chapter 655 . . . when in fact . . . St. Mary's had not obtained such insurance for its 1985-1986 Policy Year." St. Mary's answered, in part, "that such policy was suggested by the Office of the Commissioner of Insurance and subsequently approved by it as required" under the statutes. On cross-motions for summary judgment, the trial court dismissed PCF's action concluding:

> While St. Mary's was probably on the very edges of the law, . . . it did comply. . . . Even assuming any of the fronting policies did not contain technical language making them comply with Wisconsin law, by operation of law the policies would have been so conformed as to meet those requirements.
>
> While it may appear that St. Mary's was self-insured under the fronting scheme, it did in fact have a bona fide risk shifting third party insurance policy that complied with Sec. 655.23, Wis. Stats. . . .
>
> What St. Mary's did was obtain third-party primary insurance but with deductibles that in a way made it appear to be self-insurer [sic], but as a matter of law it was not. Whether that is right or wrong as a matter of policy is not for this Court to decide. The statute has requirements, and the statute does not say an entity like St. Mary's cannot purchase policies that have deductibles up to the policy limits. The bottom line is that St. Mary's technically complied with the statute and by doing so was in compliance with its Chapter 655 obligations. The St. Mary's scheme did not breach any fiduciary obligation to the Compensation Fund.

The trial court explained that its decision was influenced by the fact "that in 1988 when the Fund learned what St. Mary's was doing with this fronting policy scheme, an action was taken to create an administrative insurance regulation [WIS. ADM. CODE § INS.] 17.35(4), that would bar entities like St. Mary's from doing what it was doing." Thus, the trial court reasoned, "[t]hat such a regulation was created shows that what St. Mary's was doing with its fronting policies technically complied with the mandatory insurance regulations under Chapter 655, STATS. Had the fronting policies not been in compliance, there would have been no need for an administrative regulation when limiting their use." Thus, the trial court further concluded:

> What we have here, with all due respect, is a clever entity taking advantage of a type of loophole in Chapter 655. While I do not approve of what St. Mary's did here, I find they [sic] complied with the statu[t]e; and on that basis, this case must be dismissed.
>
> Apparently the loophole has been closed by administrative regulation. It is not my place to superimpose my judgment for that of the legislature. The statute is clear and unambiguous. St. Mary's manipulated it to its advantage; and it's not an uncommon fact of legal life of American corporations; and St. Mary's is, after all, a corporation. I'm not saying that St. Mary's did anything wrong, but this is one of those cases where good attorneys pushed this thing right to the edge; and that's why we're here today. . . .
>
> . . . St. Mary's found a way to comply [with Chapter 655], albeit in a technical, legalistic kind of way. Nevertheless, it did comply; and the Fund was

liable to pay on the three claims that comprised this restitution action.

## IV. ANALYSIS

Reviewing a trial court order granting summary judgment, we apply the same standards as the trial court, set forth in § 802.08, STATS. *Wisconsin Patients Compensation Fund*, 200 Wis. 2d at 606, 547 N.W.2d at 580. The issues in this appeal require the interpretation and application of Chapter 655, STATS., thus presenting questions of law which we review *de novo*. *Id.*

### A. Qualification as Self-Insurer

The statutes dispositive of the primary issue in this appeal—whether St. Mary's qualified as a self-insurer—are clear and unambiguous. Section 655.27(1), STATS., stated that the PCF is liable "only for payment of claims against health care providers . . . who have complied with this chapter." Section 655.23(5), STATS., permitted a provider to gain secondary insurance through the PCF "if the health care provider has met the requirements of this chapter." Sections 655.23(3)(a) and (b) allowed that a provider could comply and meet the requirements of Chapter 655, STATS., by qualifying as a self-insurer. And § 655.23(3)(a) specified that qualification as a self-insurer "shall be subject to the approval of the commissioner *and is valid only when approved by the commissioner*." (Emphasis added.) The undisputed facts establish that St. Mary's never qualified as a self-insurer and, therefore, was not entitled to any PCF secondary insurance coverage.

33

St. Mary's asserts that fronting policies such as those it employed with Aetna, St. Paul, and Hallmark have become commonplace; that no law prohibited an "insured-pays-first" endorsement; and that its policies satisfied the concerns the legislature sought to address in Chapter 655, STATS. Thus, St. Mary's contends, the OCI *could* have or *should* have approved its fronting policies. St. Mary's arguments, however, simply miss their mark. Whatever may have been the merits of the policies, St. Mary's failed to offer any factual basis on which we could conclude that the OCI ever actually approved any of them.

■

The undisputed facts establish that when St. Mary's initially submitted its self-insurance policy, fully disclosing the role of DCNHS, the OCI rejected it. The facts further establish that when St. Mary's subsequently submitted self-insurance fronting policies with Aetna, St. Paul, and Hallmark, it failed to disclose the real role of DCNHS and, further, failed to reveal the side agreements relieving the insurers of the insurer-pays-first requirement. Thus, under § 655.23(3)(a), STATS., one may view this either of two ways: (1) St. Mary's self-insurance plans were not "valid" because they never were "approved" by the OCI; or (2) the St. Mary's plans were not "valid" because the ones "approved" by the OCI, based on St. Mary's incomplete disclosures, were not actually the plans under which St. Mary's self-insured. Either way, St. Mary's never qualified as a self-insurer.

### B. Conformance to Law

St. Mary's additionally argues, and the trial court also concluded, however, that even if its fronting policies were not proper, they still were in compliance

because, under Chapter 655, STATS., they automatically were conformed to law. St. Mary's bases this theory on § 631.15(2), STATS., which provided, in part, that if a policy "violate[d] a specific statutory provision," it still was "enforceable against the insurer as if it conformed to the violated statute." Rather obviously, however, this provision is part of the statutory structure in place to protect insureds in their contractual relationships with providers and insurers, not to excuse a provider's or insurer's noncompliance.[6] To conclude otherwise would be to allow a provider to submit an apparently proper primary insurance plan, gain OCI approval, implement a secret non-compliant plan and, upon its discovery, be cleansed by statutory conformance to law. Such an interpretation of § 631.15(2) would be absurd; it would eliminate a key incentive for providers and insurers to comply with Chapter 655. *See NCR Corp. v. DOR*, 128 Wis. 2d 442, 456, 384 N.W.2d 355, 362 (Ct. App. 1986) ("Courts must look to the common sense meaning of a statute to avoid unreasonable and absurd results."); *see also State v. Koch*, 195 Wis. 2d 801, 816, 537 N.W.2d 39, 45 (Ct. App. 1995) (conformance to law provision of Worker's Compensation Act may not be invoked by insurer to excuse failure to provide statutorily-required coverage).

St. Mary's conformance-to-law argument under § 655.24(1), STATS., is equally ironic. Section 655.24(1), in part, provided:

---

[6] *See* Legislative Council Note, 1975, WIS. STAT. ANN. § 631.15 (West 1995), explaining that "[t]his section deals with the 'private law' consequences of violation. . . . 'Private law' is concerned with the rights of the parties among themselves; 'public law' with the application of official sanctions."

> The filing of a policy form by any insurer with the commissioner for approval shall constitute, on the part of the insurer, a conclusive and unqualified acceptance of all provisions of this chapter, and an agreement by it to be bound hereby as to any policy issued by it to any health care provider.

St. Mary's never even attempts to explain how, after the fact, this or any other conformance-to-law provision of the statutes or the policies themselves could somehow undo and redo the administration, defense, and payment of claims completed under secret side agreements the OCI never reviewed or approved. To say the least, it would be absurd for this court to allow a provider to betray its "conclusive and unqualified acceptance of all provisions" of Chapter 655, STATS., by permitting it to shield its betrayal behind the very statute it betrayed.

## C. Equitable Estoppel

St. Mary's offers a variety of theories to support its argument that PCF is equitably estopped from recovering its payments. Essentially, St. Mary's contends that either the OCI approved its plans, or the OCI could or should have approved its plans, or even if the OCI would not have approved its plans, PCF still only paid legitimate claims it would have paid under proper plans. Some of these theories, of course, are based on St. Mary's factually inaccurate argument that the OCI approved its fronting policies. The others all are based on equitable principles—principles properly invoked, however, only by parties with "clean hands." Given the facts of this case, it is ironic, to say the least, that St. Mary's would contend that PCF is equitably estopped from gaining restitution. *See Caveney v. Caveney*, 234 Wis. 637, 650, 291 N.W. 818, 824 (1940) (a party may be

estopped only when it acts with knowledge of the true facts).

It is "both ancient and universally accepted" that under the clean hands doctrine:

> he who has been guilty of substantial misconduct "in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction," shall not be afforded relief when he comes into court.

*Timm v. Portage County Drainage Dist.*, 145 Wis. 2d 743, 753, 429 N.W.2d 512, 516-17 (Ct. App. 1988) (citations omitted). Further, equitable estoppel is not applied against governmental agencies as freely as against private parties. *DOR v. Moebius Printing Co.*, 89 Wis. 2d 610, 638, 279 N.W.2d 213, 225 (1979). As the supreme court explained, we must use "utmost caution and restraint" when considering estoppel against the government "for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals." *Id.* (quoting *Schuster v. CIR*, 312 F.2d 311, 317 (9th Cir. 1962)). Thus, a party attempting to invoke equitable estoppel against a state agency must establish that the acts of the agency amounted to a fraud or a manifest abuse of discretion. *Ryan v. DOR*, 68 Wis. 2d 467, 471, 228 N.W.2d 357, 359 (1975). Here, even were we to accept St. Mary's spin on the undisputed facts, we at most could only surmise that the OCI somehow sent mixed signals to St. Mary's on the subject of fronting policies. Absolutely nothing in the summary judgment

submissions, however, suggests that the OCI defrauded St. Mary's or manifestly abused its discretion in any way.

### D. Remedy

Finally, St. Mary's argues that even if we conclude that it failed to qualify as a self-insurer, PCF still is not entitled to restitution because the civil forfeiture provisions of § 655.23(6), STATS.,[7] established the exclusive remedy for a provider's violations of Chapter 655, STATS. Although concluding that "it is self-evident that if St. Mary's was not in compliance that [PCF] would be entitled to damages," the trial court agreed with St. Mary's that PCF's "sole remedy would have been to seek a $1,000 per week forfeiture for the period of noncompliance" because that was the only remedy specified in Chapter 655. In reaching that conclusion, however, the trial court did not have the benefit of the supreme court's analysis in *Wisconsin Patients Compensation Fund*, decided seven months after the trial court decided the instant case.

In *Wisconsin Patients Compensation Fund*, the supreme court considered, among other things, "the nature and scope of the [PCF's] authority" with respect to PCF's suit seeking subrogation, contribution, or indemnification against a provider's insurer to recover a portion of a settlement it (PCF) had paid. *Wisconsin Patients Compensation Fund*, 200 Wis. 2d at 604, 547 N.W.2d at 579-80. The supreme court rejected the insurer's theory that, under the doctrine of *expressio unius est exclusio alterius*, the PCF's specific statutory

---

[7] Section 655.23(6), STATS., provided in part:

Whoever violates this section shall forfeit to the state not more than $1,000 for each violation. Each week of delay in compliance with this section shall constitute a new violation.

authority to bring actions for failure to act in good faith or breach of fiduciary responsibility necessarily precluded it from bringing other actions against an insurer.[8] The supreme court explained:

> [T]he *expressio unius* canon "requires caution in its application."
>
> Before the canon is deployed, . . . "[t]here must be some factual evidence that the legislature intended the application of the *expressio unius* rule." For while the canon may be based upon "logic and the working of the human mind," it is not a " 'Procrustean standard to which all statutory language must be made to conform.' "
>
> [The insurer] has offered no factual evidence that the legislature intended the application of the *expressio unius* canon, and our review of the legislative history reveals none. We therefore decline [the insurer's] invitation to apply it here.
>
> Instead we approach the interpretation of chapter 655 as we would approach the interpretation of any statute—with the object of discerning the intent of the legislature. In interpreting legislative intent, this court has declared that a legislatively created agency or board has those powers "which are, by necessity, to be *implied* from the four corners of the statute under which it operates." The power to sue may be implied when the power "is

---

[8] In 1985 the legislature amended Chapter 655 to require that providers and insurers "act in good faith and in a fiduciary relationship with respect to any claim affecting the fund." Section 655.27(5)(b) and (c), STATS., and to authorize the PCF board of governors to "bring an action against an insurer, self-insurer or health care provider for failure to act in good faith or breach of fiduciary responsibility." Section 655.27(7), STATS. *See Wisconsin Patients Compensation Fund v. Wisconsin Health Care Liab. Ins. Plan*, 200 Wis. 2d 599, 608, 547 N.W.2d 578, 581 (1996).

necessary to carry out an express power or to perform an express duty, or [when] the action arises out of the performance of statutory . . . obligations. . . ."

*Id.* at 610-12, 547 N.W.2d at 582 (citations omitted).

Although the supreme court then went on to address the specific issue involving PCF's suit against a provider's *insurer*, its language encompassed policy considerations that, the court noted, reached to suits against *providers* as well:

[T]he board of governors charged with managing the [PCF] is endowed with the requisite authority to perform all of the functions of trustees under the common law of trusts. A trustee . . . has the power and duty "to institute action and proceedings for the protection of the trust estate . . . and to take all legal steps . . . reasonably necessary with relation to those objectives." . . .[The PCF's] board of governors, as trustees under Wis. Stat. § 655.27(6), may bring an action against a health care provider or an insurer if the board determines that such an action is needed to protect the [PCF].

*Id.* at 615-16, 547 N.W.2d at 584 (citations omitted; first and last ellipses added). The supreme court then further emphasized that "reading the statute as we read it today helps insure that the [PCF] makes only those payments which the statute itself prescribes." *Id.* at 618, 547 N.W.2d at 585.

■ Similarly, "for the protection of the trust estate," Chapter 655, STATS., clearly requires that before a provider may take advantage of PCF secondary insurance coverage, it must qualify. It is preposterous to propose, as St. Mary's does, that a suit for restitution would not be among the "legal steps . . . reasonably necessary" for

40

PCF to protect the trust upon discovery of payments to an unqualified provider. Here, also, just as the supreme court declared in *Wisconsin Patients Compensation Fund*, reading Chapter 655 "as we read it today helps insure that the [PCF] makes only those payments which" Chapter 655 allows. *See id.* Accordingly, PCF was entitled to restitution for all payments it made to St. Mary's during the period St. Mary's failed to qualify as a self-insured provider.

## V. CONCLUSION

Therefore, we conclude that the trial court erred in granting summary judgment for St. Mary's. We reverse and remand for entry of summary judgment for PCF, and for the trial court's consideration of St. Mary's counterclaim for recovery of the assessments it paid for participation in the PCF program of secondary coverage during the period encompassed by these claims.[9]

*By the Court.*—Judgment reversed and cause remanded with directions.

■

[9] St. Mary's also argues that an independent basis for affirmance of the trial court judgment is that the Brooks, Marcus, Klafke claims were not " 'made' during the period of time in which St. Mary's had 'insured-pays-first' fronting policies" and, therefore, compliance with Chapter 655, STATS., was "totally irrelevant." As PCF correctly replied, however, under § 655.27 (1), STATS., "the PCF provides *occurrence* coverage—i.e., coverage determined on the basis of the date of the occurrence." We also note that St. Mary's always treated the Brooks, Marcus, and Klafke claims based on their occurrence dates.