**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HAYNES TRANE SERVICE
AGENCY, INC.,

   Plaintiff,

and

FREDERICK M. HAYNES,

   Plaintiff - Appellant,

v.

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

   Defendant - Appellee,

_____

HAYNES TRANE SERVICE
AGENCY, INC.,

   Plaintiff - Appellant,

FREDERICK M. HAYNES,

   Plaintiff,

v.

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

   Defendant - Appellee,

No. 07-1440

No. 07-1441

_____

FREDERICK M. HAYNES,

        Plaintiff - Appellant,

HAYNES TRANE SERVICE
AGENCY, INC.,

        Plaintiff,

v.                                  No. 08-1100

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

        Defendant - Appellee,

_____

HAYNES TRANE SERVICE
AGENCY, INC.,

        Plaintiff - Appellant,

FREDERICK M. HAYNES,

        Plaintiff,

v.                                  No. 08-1102

AMERICAN STANDARD, INC.,
d/b/a THE TRANE COMPANY,

        Defendant - Appellee.

## ORDER

Before **HARTZ, TYMKOVICH** and **HOLMES,** Circuit Judges.

These matters are before us on the Petition for Rehearing En Banc of Appellants Haynes Trane Service Agency, Inc. and Frederick M. Haynes. We also have a response from American Standard, Inc.

Upon the panel's consideration of both pleadings, the petition for rehearing is GRANTED for the limited purpose of revising and adding a paragraph in the Economic-Loss Rule section of our Opinion, on pages 29 to 34. The Opinion filed on April 7, 2009, is vacated and the attached revised Opinion is substituted in its place.

The petition and response were also circulated to all of the judges on the court who are in regular active service. As no judge called for a poll, the request for en banc consideration of these appeals is denied.

Entered for the Court,

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER, Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HAYNES TRANE SERVICE
AGENCY, INC.,

      Plaintiff,

and

FREDERICK M. HAYNES,

      Plaintiff - Appellant,

v.                                  No. 07-1440

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

      Defendant - Appellee,

_____

HAYNES TRANE SERVICE
AGENCY, INC.,

      Plaintiff - Appellant,

FREDERICK M. HAYNES,

      Plaintiff,

v.                                  No. 07-1441

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

      Defendant - Appellee,

—————————————

FREDERICK M. HAYNES,

      Plaintiff - Appellant,

HAYNES TRANE SERVICE
AGENCY, INC.,

      Plaintiff,

v.                                  No. 08-1100

AMERICAN STANDARD, INC.,
d/b/a The Trane Company,

      Defendant - Appellee,

—————————————

HAYNES TRANE SERVICE
AGENCY, INC.,

      Plaintiff - Appellant,

FREDERICK M. HAYNES,

      Plaintiff,

v.                                  No. 08-1102

AMERICAN STANDARD, INC.,
d/b/a THE TRANE COMPANY,

      Defendant - Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
(D.C. No. 1:95-CV-01700-RPM)

Marcy G. Glenn, Holland & Hart LLP, Denver, Colorado, (Christopher A. Crisman, Holland & Hart LLP; J. Lawrence Hamil and Charles B. Hecht, Hamil/Hecht LLP, Denver, Colorado, with her on the briefs) for Plaintiffs - Appellants,

Daniel M. Reilly (Larry S. Pozner, Sean Connelly, Kent C. Modesitt, and Clare Pennington, with him on the brief), of Reilly Pozner & Connelly LLP, Denver, Colorado, for Defendant - Appellee.

Before **HARTZ**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

**HARTZ**, Circuit Judge.

This is the second appeal in litigation between Plaintiffs/counterdefendants Frederick M. Haynes (Mr. Haynes) and Haynes Trane Service Agency (HaynesTSA) and Defendant/counterclaimant American Standard d/b/a Trane (Trane). For almost four decades Mr. Haynes operated a Denver-based franchise of Trane, a manufacturer of heating, ventilation, and air conditioning (HVAC) products. After receiving his franchise, Mr. Haynes formed HaynesTSA, which initially functioned as a service wing of his operations. HaynesTSA later entered into a separate agreement with Trane to distribute certain HVAC products. The disputes arose when HaynesTSA cheated Trane by abusing a rebate program under which Trane would reduce the price it charged retailers, such as

HaynesTSA, to enable them to meet the retail prices of products sold by their competitors. Trane terminated its distributorship agreement with HaynesTSA and, shortly thereafter, terminated Mr. Haynes's franchise. Mr. Haynes and HaynesTSA brought suit in the United States District Court for the District of Colorado. Trane counterclaimed.

An initial jury trial and appeal, *see Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 51 F. App'x 786 (10th Cir. 2002) (*Haynes I*), whittled the case down to the following claims: (1) Mr. Haynes's claim that Trane, despite language in the franchise agreement permitting it to terminate the franchise at will, could terminate only for good cause (which it lacked) because statements and conduct by Trane had either (a) modified the agreement to require good cause or (b) equitably estopped Trane from denying that the agreement required good cause; (2) claims by both Mr. Haynes and HaynesTSA that Trane breached fiduciary duties; and (3) Trane's counterclaims against HaynesTSA (a) for fraud based on its abuse of the rebate program and (b) for unjust enrichment and an accounting arising out of HaynesTSA's allegedly fraudulent acts.[1]

Before the second trial the district court ruled that Trane's unjust-enrichment claim added nothing to its fraud claim; that its accounting claim was

---

[1] Trane also brought a breach-of-fiduciary-duty claim against Mr. Haynes, alleging that he set up "'dummy contractor transactions'" to collect undeserved commissions on Trane products. Aplts. App. Vol. I at 240. The district court granted judgment as a matter of law against this claim at the close of evidence at the second trial and Trane has not appealed that ruling.

dependent on Trane's proving its fraud claim; and that if Trane did prove fraud, an equitable accounting would be performed because a jury would have difficulty calculating Trane's damages. At the close of the Plaintiffs' case at the second trial the court granted judgment as a matter of law (JMOL) against the modification-of-contract claim of Mr. Haynes and the fiduciary-duty claims of Mr. Haynes and HaynesTSA. The jury then returned verdicts that Mr. Haynes had established the elements of his equitable-estoppel claim and that Trane had established its fraud counterclaim. After the jury was discharged, the court ruled that Mr. Haynes's misconduct precluded application of an equitable doctrine in his favor and, despite the jury's verdict, entered judgment for Trane on Mr. Haynes's equitable-estoppel claim. And with respect to Trane's fraud claim, the court appointed a special master for an accounting to determine damages. Before the special master heard any evidence, however, the parties stipulated that Trane's damages were $1,770,000.

Mr. Haynes and HaynesTSA appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part. Mr. Haynes's breach-of-contract claim was properly dismissed because (1) Mr. Haynes presented insufficient evidence that his franchise agreement had been modified, and (2) his unclean hands gave the district court authority to deny him an equitable-estoppel remedy. We reject Mr. Haynes's argument that our rulings on the first appeal regarding the sufficiency of his evidence of modification bound

the district court under the law-of-the-case doctrine, because the evidence he presented at the second trial was materially inferior to the evidence that we considered on that appeal. In addition, the district court did not err in dismissing the fiduciary-duty claims of Mr. Haynes and HaynesTSA, because they failed to establish the requisites of a fiduciary relationship. Again, the law-of-the-case doctrine does not assist Mr. Haynes on this claim because the evidence at trial was materially inferior to the evidence that we considered on the first appeal. Finally, the district court erred in appointing a special master to calculate Trane's damages, because the calculation was not too complicated for a jury. A recalculation of damages by a jury, however, will also require resolving liability issues, so we must remand for a full trial of Trane's fraud claim.

## I.    BACKGROUND

### A.    The Parties' Relationships

The second trial lasted 16 days. To put our analysis in context, we summarize here the essential evidence at that trial. Additional evidence will be addressed in our discussion of specific issues.

Mr. Haynes's relationship with Trane began in 1958 when he took a sales position at Trane's Boston franchise. Over the course of the next decade he took on increasing responsibility and in 1967 his efforts were rewarded with an offer to run Trane's Denver franchise. The franchise agreement was for an

"indeterminate" length, and provided that it could be "terminated by either party upon 30 days notice to the other." Aplts. App. Vol. XII at 5388.

Mr. Haynes formed HaynesTSA soon after he received the franchise. Initially HaynesTSA was a service wing of Mr. Haynes's operations. Its role expanded in 1990, however, when it entered into an agreement with Trane to distribute Trane's unitary HVAC products, smaller units for residential and light-commercial applications. Although the initial agreement was for a term of five and one-half months, it was renewed on a yearly basis the following five years in substantially the same form. Either party could terminate the agreement at will upon proper notice.

Central to this case is a flexible pricing program that Trane developed through a series of policy statements or "Sales Plan[s]" provided to its distributors. The program helped Trane distributors compete for business. Thus, although the program was not set forth in HaynesTSA's contract with Trane, HaynesTSA had good reason to participate.

The program worked as follows: If a distributor risked being underbid by its competition, it could request a lowered price quote from Trane. If the request was granted, the distributor could then sell the product at a reduced price and "claim back" (that is, seek from Trane) a portion of the reduction. *Id.* Vol. XIII at 5984. As a precaution against error or fraud, distributors were required to accompany claimbacks with the invoice number for the sale and retain a copy of

the invoice for two years, thereby enabling Trane to determine whether a distributor ultimately sold the unit for the stated price. If a discrepancy was discovered before Trane credited a claimback, Trane adjusted the claimback; but even after a claimback was credited, Trane reserved the right to recover the "amount of credit improperly claimed." *Id.* Vol. XIII at 5988.

Although Mr. Haynes was president of HaynesTSA, he had little experience in the unitary-products market and therefore hired Willard Forward to manage that company's distributorship venture. Forward and his subordinates gamed the claimback program in a number of ways. Denice Louder, a billing administrator at HaynesTSA, testified that at Forward's behest she routinely submitted claimbacks that stated a price quote below the actual price at which HaynesTSA sold the item. She also testified that HaynesTSA submitted some claimbacks for nonexistent projects and others for units that had been secretly sold to Trane salesmen (claimbacks were available only for units sold to final customers). All told, Louder testified that "nearly every one" of the claimbacks that she submitted to Trane contained "something that wasn't completely right." *Id.* Vol. XI at 4983.

Periodically, Trane would request random invoices from HaynesTSA to determine whether the amount HaynesTSA billed a customer matched the price stated in a claimback. When there was a mismatch, Louder would recreate or alter the customer invoice so that it comported with the claimback documents previously submitted to Trane. But HaynesTSA was not able to conceal the fraud

-8-

completely. HaynesTSA's unusually high claimback rate (that is, the percentage of units for which it sought a claimback) led Trane to conduct an on-site audit of its books in 1995. Trane's auditor would ultimately visit HaynesTSA's offices on three occasions—March 6, April 3–5, and April 17–18—and discover significant discrepancies between HaynesTSA's claimback submissions and its customer invoices.

During the weeks between the announcement of the audit in mid- or late-February and the arrival of Trane's auditor on March 6, HaynesTSA employees engaged in a concerted, though ultimately unsuccessful, effort to replace customer invoices with fraudulent invoices that matched the representations supporting the claimbacks. This effort came to the attention of Mr. Haynes when two employees, Denice Louder and Vicki Graves, told him that invoices were being retyped to give to Trane's auditors and that employees were, in effect, "covering our tracks." *Id.* Vol. VI at 2479. Mr. Haynes asked HaynesTSA's chief financial officer, Steven Moss, to investigate the matter. Moss reported back to Mr. Haynes that invoices were indeed being recreated for the claimback audit.

Mr. Haynes, however, did not inform Trane of the coverup, despite several opportunities to do so. He said nothing to Trane's auditor on March 6. On March 17 a former HaynesTSA employee informed Trane that HaynesTSA was generating false claimback documentation. Trane officials flew to Denver and confronted Mr. Haynes with that accusation on March 21. During the meeting

-9-

Mr. Haynes adamantly denied that HaynesTSA kept "two sets of books," *Id.* Vol. V at 2265, again neglecting to mention that fake invoices had been typed for the audit.

During the continuation of the audit in April, the extent of HaynesTSA's abuse of the claimback program became apparent. Extrapolating from the limited sample of claimbacks reviewed, the auditor estimated that HaynesTSA had collected $852,000 in undeserved claimbacks. Trane also confirmed that HaynesTSA had attempted to conceal discrepancies by altering and recreating invoices. When Trane confronted Mr. Haynes with its findings, he asked for the auditor's report so that he could investigate its accuracy; he did not confess his awareness of the coverup effort.

On June 6 Trane terminated HaynesTSA's distributorship agreement. Shortly thereafter it gave Mr. Haynes notice that it would terminate his franchise in 30 days (the length of notice required by the franchise agreement). When it terminated the franchise agreement, Trane suspected that Mr. Haynes was aware of the claimback abuses. That suspicion would be confirmed during the second trial when Mr. Haynes testified that he had been aware before the March 6 audit that HaynesTSA employees were recreating invoices to give to Trane's auditors.

## B. Procedural History

The first trial and appeal in this case are relevant to this appeal insofar as our rulings on the first appeal established the law of the case, which the district

court was presumptively obliged to follow on remand. That law of the case must be addressed in our discussion of three issues on appeal. But we postpone our summary of the earlier proceedings until our discussions of the law-of-the-case issues. For now, we summarize only the proceedings after remand.

Mr. Haynes's primary allegation at the second trial was that Trane breached his franchise agreement by terminating it without good cause. According to Mr. Haynes, good cause was lacking because any abuse of the claimback program or subsequent coverup occurred at HaynesTSA, not at his franchise. Although the franchise agreement stated that it was terminable at will after 30-days' notice, Mr. Haynes contended that it had been modified by Trane's consistent pattern of terminating franchises only for cause. Alternatively, he alleged that various representations by Trane induced him to rely on a good-cause requirement, which, under principles of equitable estoppel, Trane could not deny. Trane defended on the grounds that the franchise agreement had not been modified and that it had made no representations that could support an equitable-estoppel claim. It also asserted that Mr. Haynes's unclean hands made it improper to apply equitable estoppel for his benefit.

In addition, both Mr. Haynes and HaynesTSA asserted that Trane had breached fiduciary duties arising from a confidential relationship. They alleged that while Trane had made gestures to induce their trust, it was in fact scheming to cut out middlemen and assume control of their operations. In their view, Trane

-11-

had used HaynesTSA's erroneous claimbacks as an excuse to carry out this underhanded policy. Trane denied that it had any fiduciary relationship with either Plaintiff.

Trane countered with a fraud claim against HaynesTSA, alleging that HaynesTSA had knowingly submitted false claimback requests and schemed to cover up its efforts. Trane also raised claims against both Plaintiffs for unjust enrichment and an accounting, specifying in the pretrial order that these equitable matters could be addressed by the district court at an "appropriate time." *Id.* Vol. I at 241. In response to these counterclaims, the Plaintiffs contended that Trane's fraud claim was precluded by the economic-loss rule (which bars certain tort claims for economic loss arising out of a contractual relationship) and that Trane's equitable claims for unjust enrichment and an accounting were not maintainable because fraud damages would provide Trane with an "'adequate remedy at law.'" *Id*. at 242.

Mr. Haynes and HaynesTSA did not prevail on any of their claims at trial. At the close of evidence the district court granted JMOL against Mr. Haynes's modification-of-contract claim. On his equitable-estoppel claim the jury found that he had established the elements of equitable estoppel and that Trane had terminated Mr. Haynes's franchise agreement without good cause. But the court nevertheless granted judgment to Trane on this claim, reasoning that Mr. Haynes's failure to inform Trane of the claimback coverup made it improper

-12-

to apply an equitable doctrine in his favor. As with Mr. Haynes's contract-modification claim, the district court disposed of the Plaintiffs' fiduciary-duty claims by granting JMOL against them at the close of evidence.

Trane prevailed only on its fraud claim. During a pretrial hearing the district court had ruled that Trane's unjust-enrichment and accounting claims were not viable as freestanding equitable claims. At the same time, the court concluded that Trane lacked an adequate remedy at law for fraud because having a jury review individual claimbacks to calculate damages would unduly prolong proceedings. Accordingly, the court construed Trane's accounting claim as merely seeking a remedy for fraud, ruling that if Trane prevailed on its fraud claim at trial, an equitable accounting would be performed to calculate its damages. The court rejected HaynesTSA's economic-loss-rule argument during the same hearing. The jury then found that HaynesTSA had "followed a pattern or practice of fraudulent conduct in submitting" claimbacks. *Id.* Vol. II at 682–84. Over HaynesTSA's objection, the court appointed a special master for an accounting "of the amount of damages Trane sustained." *Id.* Vol. III at 980. But the special master never had occasion to calculate Trane's damages. After HaynesTSA reserved the right to appeal the special master's appointment, the parties stipulated that Trane's fraud damages were $1,770,000. The district court adopted the parties' damages stipulation and awarded Trane an additional $2,982,763.47 in prejudgment interest and costs.

Mr. Haynes and HaynesTSA appeal, presenting the following issues: (1) whether the district court violated the law of the case determined in the first appeal by granting JMOL against Mr. Haynes's modification-based contract claim; (2) whether the court exceeded its equitable authority and contravened the jury's verdict by refusing to grant equitable-estoppel relief to Mr. Haynes; (3) whether the court violated the law of the case by granting JMOL against the Plaintiffs' fiduciary-duty claims; (4) whether Trane's fraud claim is barred by the economic-loss rule; and (5) whether the jury should have been permitted to determine Trane's damages. We affirm the district court's resolution of all issues but the last.

## II. DISCUSSION

### A. Mr. Haynes's Breach-of-Contract Claim

#### 1. Modification

Mr. Haynes contends that his franchise agreement with Trane, which permits either party to terminate at will on 30-days' notice, was modified by Trane's statements and conduct so that Trane was required to have good cause before it could terminate the agreement. At the second trial the district court granted JMOL on this claim at the close of the evidence.

Mr. Haynes's sole contention on appeal with respect to his modification-of-contract claim is that the district court's grant of JMOL on this claim violated the law of the case by defying this court's holding on the first appeal that he had

-14-

presented sufficient evidence to support a verdict in his favor on the claim. To

assess that contention we first address the merits of the district court's decision.

It will then be clear why Mr. Haynes's law-of-the-case argument fails.

JMOL can be properly granted when "a party has been fully heard on an

issue during a jury trial" and has failed to present a "legally sufficient evidentiary

basis [for the jury] to find" in its favor. Fed. R. Civ. P. 50(a)(1). In considering

whether JMOL is warranted, a district court must draw all reasonable inferences

in support of the nonmoving party. *See McInnis v. Fairfield Cmtys., Inc.*, 458

F.3d 1129, 1136 (10th Cir. 2006). We review a district court's grant of JMOL de

novo. *See id.*

The parties assume that Wisconsin law governs Mr. Haynes's franchise

agreement and, in particular, whether that agreement was modified to require

good cause for termination. We thus proceed from the same assumption. *See*

*Grynberg v. Total, S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) (adopting parties'

assumption of applicable law). Under Wisconsin law a contract can be modified

by the conduct of the contracting parties but only when the acts are "unequivocal

in their character." *Nelson v. Farmers Mut. Auto. Ins. Co.*, 90 N.W.2d 123, 134

(Wis. 1958) (internal quotation marks omitted); *accord Carnes Co. v. Stone Creek*

*Mech., Inc.*, 412 F.3d 845, 853 (7th Cir. 2005) (applying Wisconsin law). "Acts

which are ambiguous in their character, and which are consistent either with the

continued existence of the original contract, or with modification thereof, are not

sufficient to establish a modification." *Nelson*, 90 N.W.2d at 134 (internal quotation marks omitted).

Thus, to prevail on his modification claim, Mr. Haynes had to show that Trane acted in a way that was unequivocally inconsistent with enforcing the franchise agreement as it was written, that is, as an agreement that could be terminated without cause. Mr. Haynes did not meet this burden. At best, the evidence presented by Mr. Haynes showed that Trane had consistently provided cause when terminating franchises in the past. In particular, Mr. Haynes testified that he had never heard of a franchise being terminated without cause and that, when discussing terminations, Trane had "always emphasized a cause." Aplts. App. Vol. V at 2047. Likewise, Trane official Don O'Keefe testified that every franchise termination of which he was aware had been "with cause." *Id.* Vol. VI at 2615. But a pattern of terminating with cause is not unequivocally inconsistent with retention of the power to terminate without cause. Trane could properly reserve the extraordinary power to terminate without cause even though it had never had occasion to exercise that power. The Wisconsin Supreme Court has recognized that prior failure to exercise a contractual right is not unequivocally inconsistent with enforcing that right. *See Presser v. Siesel Constr. Co.*, 119 N.W.2d 405, 408–09 (Wis. 1963) (failure to request construction of contractually required barricade not an unequivocal act that would support a contractual modification).

-16-

Mr. Haynes attempts to overcome these legal principles with a law-of-the-case argument.  He correctly points out that in *Haynes I* we held that the district court had erred in granting JMOL against the same contract-modification claim. *Haynes I*, 51 F. App'x at 793–94.  According to Mr. Haynes, our decision in *Haynes I* mandated that his modification claim go to the jury on remand.  We disagree.

The law-of-the-case doctrine generally "dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224 (10th Cir. 2007).  The doctrine is not, however, an "inexorable command"; our precedents recognize several exceptions to its operation. *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143 (10th Cir. 2006) (internal quotation marks omitted).  We have said, for example, that a judicial determination is not the law of the case in later proceedings involving "substantially different" evidence. *Id.* (internal quotation marks omitted).  That exception applies here.  Mr. Haynes presented substantially weaker evidence of a contractual modification in the second trial.

In *Haynes I* we noted three items of testimony that prevented the court from properly granting JMOL:  (1) Mr. Haynes's testimony that "Trane officials, at franchisee meetings, communicated Trane's policy of only terminating franchise agreements for cause," 51 F. App'x at 793 (Mr. Haynes had testified that it was "Trane's stated policy that they only terminated franchise holders for cause,"

-17-

Aplts. App. Vol. IV at 1545); (2) the testimony of Trane official Don O'Keefe that "he interpreted franchise agreements to require cause for termination, and that he had never terminated a franchise agreement without cause," *Haynes I*, 51 F. App'x at 793; and (3) the testimony of another Trane official, James Schultz, "that he was not aware of any time when a franchise agreement was terminated except for cause," *id.*

Thus, the evidence presented at the first trial showed both a pattern of terminating for cause and, more importantly, a "stated policy" of terminating only for cause—indeed, one that a Trane official felt was contractually required. Aplts. App. Vol. IV at 1545; *Haynes I*, 51 F. App'x at 793. The evidence of a communicated policy was necessary to our decision in *Haynes I*, because a *policy* of terminating franchises only for cause would be inconsistent with enforcing an at-will provision. The absence of that evidence at the second trial (for reasons unknown to us) was a crucial difference. In that circumstance, the district court was not bound by our previous determination that JMOL was improperly granted against Mr. Haynes's modification claim at the first trial.

### 2. Equitable Estoppel

Mr. Haynes argues next that even if the franchise agreement was not modified to contain a good-cause requirement, Trane should have been equitably estopped from denying the requirement. Under Wisconsin law the doctrine of equitable estoppel has four elements: "(1) action or non-action, (2) on the part of

one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment." *Milas v. Labor Ass'n of Wis., Inc.*, 571 N.W.2d 656, 660 (Wis. 1997). The jury found that Mr. Haynes had established the elements of the claim. Nevertheless, the district court refused to apply the equitable-estoppel doctrine for Mr. Haynes's benefit. The court reasoned that Mr. Haynes "did not fairly deal with Trane" in relation to HaynesTSA's abuse of the claimback program. Aplts. App. Vol. III at 1407. It stressed that Mr. Haynes had been told by HaynesTSA employees that they were retyping invoices in preparation for Trane's audit yet he did not relay this information to Trane or its auditors. The court concluded that such misconduct by Mr. Haynes "must not be rewarded" with a grant of equitable relief. *Id.* at 1410. On appeal Mr. Haynes contends that the district court erroneously denied him the benefits of equitable estoppel. "We review the district court's refusal to apply the doctrine of equitable estoppel for abuse of discretion." *Spaulding v. United Transp. Union*, 279 F.3d 901, 911 (10th Cir. 2002). Legal determinations underlying the court's decision are, however, reviewed de novo. *See Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005).

As Mr. Haynes concedes, Wisconsin law permits a court to deny equitable-estoppel relief despite proof of its four elements. "[O]nce the elements of equitable estoppel have been established as a matter of law, the decision to

actually apply the doctrine to provide relief is a matter of discretion." *Nugent v. Slaght*, 638 N.W.2d 594, 602 (Wis. Ct. App. 2001). In exercising its discretion, a "court must . . . take into consideration any other evidence and facts respecting the equities of the parties." *Id*. (internal quotation marks omitted); *see Meyer v. Reif*, 258 N.W. 391, 394 (Wis. 1935) (equity "'has always preserved the elements of flexibility and expansiveness'" (quoting 1 Pomeroy, Equity Jurisprudence, § 111)); *Mulder v. Mittelstadt*, 352 N.W.2d 223, 229 (Wis. Ct. App. 1984) (same).

One factor considered by courts is whether the party requesting the equitable-estoppel remedy has engaged in substantial relevant misconduct. *See Wis. Patients Comp. Fund v. St. Mary's Hosp. of Milwaukee*, 561 N.W.2d 797, 805 (Wis. Ct. App. 1997). This concern flows from the general principle that "only . . . parties with clean hands" can invoke equitable relief. *Id.* (internal quotation marks omitted). Of course, a litigant's unrelated misconduct may not be used to deny him an equitable remedy. *See Huntzicker v. Crocker*, 115 N.W. 340, 342 (Wis. 1908) ("Equity does not demand that its suitors shall have led blameless and pure lives."). To preclude relief, rather, the misconduct must be "connected with the matter in litigation" and have "in some measure affected the equitable relations subsisting between the two parties." *Id.* (internal quotation marks omitted).

Against this backdrop, we conclude that the district court did not abuse its discretion in denying Mr. Haynes the benefit of equitable estoppel on the basis of

his unclean hands. Mr. Haynes sought an equitable decree that he was entitled to keep his franchise. His fitness as a franchisee is directly related to the relief he sought. By failing to inform Trane that his employees had been retyping invoices in preparation for the claimback audit, Mr. Haynes demonstrated his untrustworthiness as a franchisee, much less a business associate. It was not an abuse of discretion to deny equitable relief when the evidence of his misconduct established that he was unworthy of being a franchisee. *Cf. McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360–61 (1995) (unclean-hands doctrine not applicable to restrict relief under statute establishing important national policy against discrimination).

On appeal Mr. Haynes argues that the district court's decision to apply the unclean-hands doctrine against him nevertheless rested on several legal errors. He argues first that his misconduct should not have been considered because the decision to apply or deny equitable estoppel must be based on "the equities of only those facts triggering the estoppel doctrine, *i.e.*, the defendant's conduct inducing the plaintiff's detrimental reliance, and the resultant harm to the plaintiff." Aplt. Br. at 29. Because Mr. Haynes's alleged failure to disclose HaynesTSA's claimback abuse was not conduct establishing one of equitable estoppel's elements, Mr. Haynes concludes that the court was not free to consider it in denying him equitable relief.

To begin with, we doubt the coherence of the legal rule proffered by Mr. Haynes. It is hard to imagine how parties invoking equitable estoppel could engage in misconduct that also established an element of equitable estoppel, such as reasonable reliance. In any event, Mr. Haynes has not cited a case that expresses or supports his proposed rule. He relies almost exclusively on a string of cases in which unclean hands was not an issue. *See N. Crossarm, Inc. v. Chem. Specialties, Inc.*, 332 F. Supp.2d 1181, 1192–93 (W.D. Wis. 2004); *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 715 N.W.2d 620, 628–630 (Wis. 2006); *Milas*, 571 N.W.2d at 660–62; *Nugent v. Slaght*, No. 02-3387, 2003 WL 22143306, at *1–2 (Wis. Ct. App. Sept. 18, 2003); *Gonzalez v. Teskey*, 465 N.W.2d 525, 530 (Wis. Ct. App. 1990).

The only other case he cites applies the general rule that only misconduct related to the "'matter in litigation'" warrants application of the unclean-hands doctrine. *Fields Found., Ltd. v. Christensen*, 309 N.W.2d 125, 136 (Wis. Ct. App. 1981) (quoting *Huntzicker*, 115 N.W. at 342)). The question in *Fields* was whether the misconduct of a medical-center official prevented the center from enforcing against its medical director a covenant not to compete. *Id*. The official had improperly held himself out as a physician and had deceived the Internal Revenue Service by representing the clinic as a nonprofit organization entitled to tax-exempt status. *Id*. But the court concluded that these misdeeds were insufficiently related to the controversy because they evidently did not prompt the

-22-

medical director to leave the center and seek competing work. *See id.* To the contrary, the director attempted to negotiate a new employment contract with the center for several months after becoming aware of the misconduct. *Id.* The case before us is readily distinguishable because Trane never exhibited lack of concern about Mr. Haynes's failure to disclose his knowledge of the claimback coverup; it had no occasion to do so because it did not know of the failure when it terminated his franchise. Unlike misconduct acquiesced in, Mr. Haynes's dishonesty bears directly on the "equitable relations subsisting between the two parties." *Huntzicker*, 115 N.W. at 342.

Mr. Haynes also argues that by holding him responsible for HaynesTSA's alleged abuse of the claimback program, the district court failed to honor HaynesTSA's distinct legal status. This argument mischaracterizes the basis of the district court's decision. In refusing to apply equitable estoppel, the court focused not on what HaynesTSA did, but rather on Mr. Haynes's personal failure to play straight with Trane during its investigation. His wearing a HaynesTSA hat did not immunize him from the consequences of his own dishonesty.

Mr. Haynes's reply brief on appeal appears to raise another argument against the application of the unclean-hands doctrine against him. He suggests that this equitable doctrine applies only to freestanding equitable claims—such as promissory estoppel—not to an equitable doctrine applied in the context of a legal claim (as equitable estoppel is applied to his breach-of-contract claim). But he

-23-

cites no supporting authority, nor does he account for the lengthy discussion in *Nugent* regarding judicial discretion in applying the doctrine of equitable estoppel. *See* 638 N.W.2d at 602–03. In any event, we need not pursue the issue further because we do not ordinarily "review arguments raised for the first time in a reply brief." *Ferry v. Gonzales*, 457 F.3d 1117, 1129 (10th Cir. 2006).[2]

Finally, Mr. Haynes argues that the district court's unclean-hands determination conflicted with the jury's finding that Trane lacked good cause to terminate his franchise. That finding, contends Mr. Haynes, implies that the jury found that he had not engaged in wrongful conduct. Thus, the district court's determination that Mr. Haynes acted reprehensibly (that is, that his hands were unclean) contradicted the jury verdict and thereby violated his right to a jury trial. We disagree.

True, the Seventh Amendment prevents district courts from applying equitable doctrines on the basis of factual predicates rejected, explicitly or implicitly, by a jury verdict. *See Bartee v. Michelin N. Am.*, *Inc.*, 374 F.3d 906, 912–13 (10th Cir. 2004). If a jury resolves a factual issue, the court "may not ignore that determination" in fashioning equitable relief or applying an equitable

_____

[2] Because we affirm the district court's application of the unclean-hands doctrine against Mr. Haynes under Wisconsin law (which Mr. Haynes would have us apply), we need not address Trane's arguments resting on federal law and, more generally, express no view on whether federal courts sitting in diversity should apply state or federal equity principles. *See generally* John T. Cross, *The Erie Doctrine in Equity*, 60 La. L. Rev. 173, 222–24 (1999).

doctrine. *Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 732 (10th Cir. 2000). But that is not the situation here. Indeed, the district court's unclean-hands determination rested on facts that the jury would not have had occasion to consider in its good-cause deliberations. In pertinent part, the court instructed the jury on good cause as follows:

> [Y]ou must also determine whether good cause existed when the Trane Company terminated the franchise agreement. . . . Good cause is defined as a fair and honest cause or reason determined in good faith on the part of the person exercising the authority to terminate. Good cause requires an exercise of good faith based upon reasonable, just, and fair grounds. Reasons that are pretextual or based on improper motive do not constitute good cause. In determining whether the Trane Company had good cause for termination, you may consider whether the Trane Company's decision followed an investigation of facts that was appropriate under the circumstances.

Aplts. App. Vol. X at 4631. This instruction makes good cause turn on what Trane's reason was when it terminated Mr. Haynes's franchise. The jury would not have considered what Trane did not know at the time of termination, such as Mr. Haynes's awareness that fraudulent invoices were being typed for Trane's audit. But it was this awareness that, according to the district court, dirtied his hands and required denial of equitable relief. Accordingly, the district court's unclean-hands determination rested on "findings not precluded by the [jury's] verdict." *Ag Servs.*, 231 F.3d at 734. Mr. Haynes's Seventh Amendment argument fails.

**B.     Plaintiffs' Fiduciary-Duty Claims**

Mr. Haynes and HaynesTSA have alleged that Trane breached fiduciary duties arising from a confidential relationship. They claim that Trane assumed fiduciary duties by inducing their trust, and breached those duties by maneuvering to squeeze, and ultimately seize control of, their operations. The district court granted JMOL against these claims at the close of evidence, and the Plaintiffs contend that in doing so it violated the law of the case established on the first appeal. As with Mr. Haynes's contract-modification claim, we consider the merits of the claim before addressing the law of the case. Our review is de novo. *See McInnis*, 458 F.3d at 1136.

Because the parties assume that Trane's fiduciary obligations (if any) were controlled by Colorado law, we assume the same. *See Grynberg*, 538 F.3d at 1346. Under that law, to prevail on a fiduciary-duty claim based on a confidential relationship, the Plaintiffs had to show that (1) they reposed trust in Trane; (2) doing so was justified or was "invited, ostensibly accepted, or acquiesced in" by Trane; (3) Trane "assumed a primary duty to represent [their] interest[s] in the subject of the transaction"; (4) "the duty that arose by reason of the confidential relationship extended to the subject matter" of their claims; and (5) they were damaged by the violation of that duty. *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. Ct. App. 2002) (internal quotation marks omitted).

We need not analyze the final four elements, for the Plaintiffs' evidence failed to satisfy the first. As the Plaintiffs stress, Mr. Haynes's testimony could

-26-

support the second element: He stated, for instance, that Trane management had told franchisees that they "should trust the Trane company," and that they were in a "partnership type of relationship." Aplts. App. Vol. V at 2202. He also testified that Trane officials stated that "Philosophically, we strive to view and treat our distributors as a partner first, a customer second, and a friend third." *Id.* at 2205. But the Plaintiffs had to show more to establish the first element; they had to show that they actually *reposed* trust in Trane. *See Equitex*, 60 P.3d at 752. They presented no evidence, however, that they trusted Trane.

Indeed, Mr. Haynes's testimony demonstrated that his relationship with Trane was, if anything, one of deepening mistrust. He explained that as early as 1975 he and other franchisees had formed an association of franchisees in response to adverse Trane policies. According to Mr. Haynes, strong disagreements arose in the 1980s when Trane limited the profits franchisees could draw from the sale of non-Trane products before sharing with Trane. Mr. Haynes explained that franchisees generally "felt very, very strongly that there was no reason for Trane to participate in third party transactions," Aplts. App. Vol. V at 2098, and that he personally viewed this and other Trane conduct as an incursion on the managerial autonomy secured by his franchise agreement. Moreover, Mr. Haynes was not concerned merely with Trane's managerial overreaching; there was a graver threat. Mr. Haynes testified that in 1985 Trane unveiled its long-term plan to acquire its independent franchises. In sum, the evidence

-27-

showed that the Plaintiffs were on their guard in their dealings with Trane. With no evidence of their reposed trust, there simply was not a "legally sufficient evidentiary basis to find" in the Plaintiffs' favor. Fed. R. Civ. P. 50(a)(1). No fiduciary relationship existed.

The Plaintiffs contend, however, that the law-of-the-case doctrine requires that we reverse the district court's rejection of their fiduciary-duty claims. They point to our holding in *Haynes I* that the district court erroneously granted summary judgment against those claims. *See* 51 F. App'x at 801. According to the Plaintiffs, that holding precluded JMOL in the second trial. We disagree.

As an initial matter, it is not certain whether a reversal of summary judgment operates as the law of the case to prevent a later grant of JMOL. *Compare Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (rejecting contention that reversal of summary judgment was law of the case preventing JMOL on ground that propriety of JMOL "is to be determined by the record that is made [after remand], not by the law of the case doctrine"), *with Kerman v. City of New York*, 374 F.3d 93, 110 (2d Cir. 2004) (law of the case bars JMOL on evidence previously deemed sufficient to overcome summary judgment). But we need not resolve that issue here. Even if a ruling on summary judgment can create the law of the case controlling a later JMOL determination, an exception to the doctrine applies here. In *Haynes I* we reversed summary judgment on the basis of an affidavit by Mr. Haynes. *See* 51 F. App'x at 801. In that affidavit he

-28-

stated that, based on the parties' long-standing relationship and a number of assurances made by Trane, he "did trust Trane." Aplts. App. Vol. I at 155G. This statement satisfied the first element of the fiduciary-duty claims. But, as noted above, his testimony at the second trial omitted this assertion. The district court did not depart from any legal principle established in *Haynes I* by ruling at the second trial that the Plaintiffs had not made out their fiduciary-duty claims. Thus, the law-of-the-case doctrine did not bar entry of JMOL. *See Wessel*, 463 F.3d at 1143.

## C. Trane's Fraud Counterclaim

We now turn to Trane's fraud counterclaim against HaynesTSA. Trane alleged that HaynesTSA knowingly submitted false claimbacks and schemed to cover up those erroneous submissions by creating phony invoices. The jury entered a special verdict that HaynesTSA had "followed a pattern or practice of fraudulent conduct in submitting claims for payment under the price assistance program." Aplts. App. Vol. II at 684. HaynesTSA contends on appeal that Trane's fraud counterclaim is barred by Colorado's economic-loss rule. It also contends that the district court erred in appointing a special master to calculate Trane's fraud damages. We disagree with the first contention but agree with the second.

### 1.    Economic-Loss Rule

Whether the economic-loss rule operates to bar Trane's fraud counterclaim "is an issue of law that we review *de novo*." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1162 (10th Cir. 2008) (internal quotation marks omitted). Again we apply Colorado law because the parties' arguments presume that it governs this claim. *See Grynberg*, 538 F.3d at 1346.

Colorado's economic-loss rule has been formulated as follows: "[A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). The rule does not bar damages claims for "physical harm to persons or property." *Id*. The Colorado Supreme Court has explained that by limiting the tort liability of contracting parties, the rule aims to "maintain the boundary between contract law and tort law." *Id*. at 1259.

In some other jurisdictions the economic-loss rule focuses on the damages alleged and whether those damages can be sufficiently linked to performance (or nonperformance) under a contract. *See Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co., Inc.*, 123 F.3d 675, 680–82 (7th Cir. 1997) (applying Wisconsin law); *Hoseline, Inc. v. U.S.A. Diversified Prods., Inc.*, 40 F.3d 1198, 1199–2000 (11th Cir. 1994) (applying Florida law). But the applicability of Colorado's rule turns on the nature of the duty allegedly breached, not the nature

-30-

of alleged damages. *See Town of Alma* 10 P.3d at 1262–63; *see also id.* at 1262 n.8 (stating that Colorado's rule would be more aptly named the "independent duty rule" (internal quotation marks omitted)). Even if a claim asserting only economic loss could be framed as a breach of contract, it is not barred by Colorado's economic-loss rule if it rests on an "independent duty of care under tort law." *Id.* at 1264.

Under Colorado law, for a duty to be "independent" of a contract, and thus actionable in tort notwithstanding the economic-loss rule, two conditions must be met. First, the duty must arise from a source other than the relevant contract. *Id.*, 10 P.3d at 1263 (mentioning fiduciary duties and certain common-law tort doctrines as examples). Second, the duty must not be a duty also imposed by the contract. *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004); *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1270 (Colo. 2000). That is, even if the duty would be imposed in the absence of a contract, it is not independent of a contract that "memorialize[s]" it. *BRW*, 99 P.3d at 74.

Trane correctly contends that tort law imposed a duty on HaynesTSA to abstain from fraud. *See Town of Alma*, 10 P.3d at 1263 (observing that a "common law fraud claim is based on violation of a duty independent of contract"). We do not understand HaynesTSA to argue otherwise. Rather, the thrust of HaynesTSA's economic-loss argument is that its alleged scheme regarding claimbacks breached express contractual duties. The alleged duty

-31-

under tort law, it asserts, was memorialized in its distributorship agreement with Trane, which required it to submit accurate claimbacks and granted Trane a right to recover any amount "improperly claimed." Aplts. App. Vol. VIII at 5988. HaynesTSA contends that Trane's fraud counterclaim boils down to an allegation that these contractual duties were breached.

Trane responds that the economic-loss rule cannot bar a tort claim for intentional fraud. But we need not reach that issue. HaynesTSA's economic-loss-rule argument fails in any event because the tort duty alleged by Trane is not duplicated in Trane's contract with HaynesTSA. HaynesTSA's distributorship agreements, including the 1995 agreement that was terminated, say nothing about claimbacks. Trane's claimback policy is not contained in the contract between Trane and HaynesTSA but solely in the "Sales Plan[s]" that Trane provided its distributors to describe Trane's practices regarding claimbacks. *Id.* at 5983-6014.

One could make a reasonable argument that the claimback policy became a contract between Trane and HaynesTSA. Indeed, Trane's counterclaim against HaynesTSA alleged that there was such a contract regarding claimbacks and that HaynesTSA had breached it. But that issue has been resolved otherwise in this case. At the close of evidence at the first trial, the district court expressed doubt regarding the viability of the contract counterclaim and pressed Trane's counsel to specify "what provision in the distributor agreement [was] breached." *Id.* Vol. IV at 1586. Trane's counsel responded that the claimback policy was

-32-

incorporated into the distributorship agreement by a provision granting Trane the right to "alter sales and distribution policies." *Id.* Vol. XIII at 5574. The court was not persuaded and granted judgment against Trane on the contract counterclaim. The basis of the ruling was the absence of a contract governing claimbacks; the court did not reach the issue of whether the purported contract was breached. That ruling went unchallenged on the first appeal (HaynesTSA did not even argue the economic-loss doctrine in support of the district court's dismissal of the fraud counterclaim) and the issue did not arise at the second trial. "A legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Concrete Works of Colo., Inc. v. City & County of Denver*, 321 F.3d 950, 992 (10th Cir. 2003) (brackets and internal quotation marks omitted). Accordingly, it is settled that Trane's claimback policies were not the subject of a contract between Trane and HaynesTSA. The premise of HaynesTSA's economic-loss argument therefore disappears. *See BRW*, 99 P.3d at 74 (economic-loss rule bars claims alleging breach of contractually memorialized duties).

We recognize that the law-of-the-case doctrine is "prudential, not jurisdictional," calling "for the exercise of an appellate court's sound discretion." *Kessler v. Nat'l Enters., Inc.*, 203 F.3d 1058, 1059 (8th Cir. 2000). And courts

exercise "a degree of leniency in applying [this] rule to issues that could have been raised by *appellees* on previous appeals," *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 741 (D.C. Cir. 1995) (emphasis added), because we do not ordinarily require appellees to raise every possible ground for affirmance in their appellate briefs, *see id.* at 740–41; *Eichorn v. AT&T Corp.*, 484 F.3d 644, 657–58 (3d Cir. 2007). But the rule has properly been applied to appellees in some cases. *See*, *e.g.*, *Kessler*, 203 F.3d at 1059–60; *Schering Corp. v. Ill. Antibiotics Co.*, 89 F.3d 357, 358–59 (7th Cir. 1996). This is such a case. After the district court ruled on October 20, 1999, that no contract governed claimbacks, HaynesTSA waited until September 12, 2005, almost six years later and barely two months before the second trial, to raise a defense based on the economic-loss rule. For the district court to rule in HaynesTSA's favor on this defense would have been inconsistent with the court's dismissal of Trane's breach-of-contract claim based on alleged claimback violations. In our view, it would be unfair to Trane to foreclose its fraud claim by applying the economic-loss rule unless its contract claim were revived. We think the better course is to leave the posture of the case as both parties accepted it for six years—with Trane's complaint for claimback abuse arising as a fraud claim, not a contract claim. Thus, we are not presented with a circumstance in which the law-of-the-case doctrine should be applied with leniency to the former appellee.

We hold that Colorado's economic-loss rule poses no bar to Trane's fraud counterclaim.

## 2. Right to a Jury on Damages

HaynesTSA's final argument is that the district court erred in not having the jury determine Trane's fraud damages. Our opinion in *Haynes I* held that "this case is one where the accounts are so complicated that an equitable accounting [of damages] may be warranted." 51 F. App'x at 800. We added, however, that an equitable remedy—such as an accounting—is not proper if there is an adequate remedy at law. *Id.* Therefore, we instructed the district court to make findings on remand regarding whether computing damages would be too complicated for a jury. *Id.*

On remand the district court found as follows: "[R]equir[ing] the jury to go through the detail of what each one of these claim-back things meant in terms of damages would prolong the trial unduly, and that makes it an inadequate legal remedy." Aplts. App. Vol. IV at 1712–13. On this basis, and over HaynesTSA's objection, the district court appointed a special master to determine Trane's damages. Although the parties ultimately stipulated to a damages figure of $1,770,000, HaynesTSA reserved the right to challenge the underlying appointment of a special master and, more generally, the court's decision to take damages away from the jury. HaynesTSA now raises those challenges on appeal. We agree that the determination of damages was a matter for the jury.

The Seventh Amendment to the United States Constitution "preserves to litigants the right to a jury trial in suits at common law." *Ross v. Bernhard*, 396 U.S. 531, 533 (1970). A fraud claim seeking only damages is an action at law to which the right to a jury inheres. *See Curriden v. Middleton*, 232 U.S. 633, 636 (1914); 9 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 2311, at 150 (3d ed. 2008); 8 James Wm. Moore et al., Moore's Federal Practice § 38.30[1][e][ii], at 38-71 (3d ed. 2008). In an action at law, parties are "entitled . . . to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *accord Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998). This final proposition is subject to a narrow exception. An accounting is proper when there exists no "adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Accordingly, damages can be taken from the jury and an equitable accounting performed when the "accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." *Id.* (internal quotation marks omitted).

In *Dairy Queen* the Court explained that modern procedural tools—such as the appointment of special masters to assist the jury with difficult matters—make it a "rare case" when computational complexities will render a legal remedy inadequate. *Id.* at 478; *see id.* at 480–81 (Harlan, J., concurring) (noting that jury

-36-

can also be assisted by "proper instructions from the court"). In *Dairy Queen* itself the Court reversed the district court's decision to strike a jury-trial demand. *Id*. at 479. The respondent in *Dairy Queen* sought monetary damages arising from trademark infringement and a contractual breach. *Id.* at 476–77. Although the complaint had been "cast in terms of an 'accounting,'" the petitioner requested a jury trial. *Id*. at 477. The district court denied that request on the ground that the action was "purely equitable" or, alternatively, that any legal issues raised were "incidental to the equitable issues." *Id*. at 470 (internal quotation marks omitted). The Supreme Court disagreed, holding that the action was legal in nature and that "the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings." *Id.* at 477–78. Moreover, the Court ruled that the parties' accounts were not sufficiently complicated to require an accounting. *Id*. at 478–79. Determining damages would require "a look into petitioner's business records." *Id*. at 479. But that task, the court concluded, could be performed by a jury. *Id*.

Although *Dairy Queen* did not eradicate the equitable-accounting remedy in actions at law, it is widely acknowledged that its analysis severely limited the circumstances in which it would be available. *See generally* Charles Alan Wright, *supra* § 2310, at 148 (noting that after *Dairy Queen*, "federal courts consistently have refused to accept [the need for an accounting] as a ground for the denial of a jury trial demand"); James Wm. Moore, *supra* § 38.30[1][e][ii], at 38-71

("[E]ven when there is some measure of complexity, a jury trial will be required if a legal remedy is sought."); *see also Bruce v. Bohanon*, 436 F.2d 733, 737 (10th Cir. 1970) (Holloway, J., concurring) (assessment of damages arising from wrongful appropriation of confidential information not sufficiently complicated to warrant an accounting). Trane has not cited to us a single case decided after *Dairy Queen* in which equitable accounting was employed to calculate damages from fraud.

In this case the district court did not make (and based on the record on appeal, could not have made) findings establishing that "only a court of equity [could] satisfactorily unravel" the parties' accounts. *Dairy Queen*, 369 U.S. at 478. All the district court found was that having a jury tediously slog through individual claimbacks would "prolong the trial." Aplts. App. Vol. IV at 1712. We can locate no support, however, for the view that a prolonged trial in itself provides an inadequate remedy at law. In any event, we see no reason why summaries could not have been used to shorten the proceedings and relieve the jury from the task of reviewing each individual claimback. *See* Fed. R. Evid. 1006 (allowing summaries); *United States v. Thompson*, 518 F.3d 832, 858–59 (10th Cir. 2008) (discussing use of summaries to condense financial data that otherwise "would have been incomprehensible to the jury"). The right to a jury trial is not to be lightly denied; and before deeming a remedy at law inadequate,

we must consider whether techniques are available to assist a jury in completing

difficult tasks. *See Dairy Queen*, 369 U.S. at 478.

Furthermore, the record developed in the second trial revealed that few, if

any, computational headaches were destined for the jury. Most significantly,

Trane's expert prepared a report before the second trial that analyzed a sample of

claimbacks. The report divided HaynesTSA's "unsupported," or erroneous,

claimbacks into four categories: (1) claimbacks for a greater quantity of items

than were actually sold; (2) claimbacks for items that were sold at a higher price

than originally approved by Trane (sell-ups); (3) claimbacks for items sold to

HaynesTSA personnel; and (4) claimbacks with inadequate or conflicting

documentation. Aplts. App. Vol. II at 897. HaynesTSA's posttrial submissions

reveal that it had few disagreements with the expert's report. Indeed, HaynesTSA

stated that a report by its own chief financial officer, Steven Moss, reached

numbers that were "not much different." *Id.* Vol. II at 872. What HaynesTSA

principally challenged was whether each of the four identified categories of

unsupported claimbacks represented fraudulent claims.

True, in *Haynes I* we remarked that an equitable accounting "may" be

proper in this case. 51 F. App'x at 800. But the record developed on remand

made plain otherwise. Although its error was understandable, the district court

should not have appointed a special master for an equitable accounting. The

Seventh Amendment entitled HaynesTSA to a jury determination of Trane's fraud damages.

We now turn to the remedy for the Seventh Amendment violation. Retrial to some extent is obviously necessary. The question is whether retrial of the fraud counterclaim can properly be limited to the issue of damages. The general rule is that a retrial may be limited to an issue only if the issue is "so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931); *see Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1256 (10th Cir. 1999). If "the question of damages . . . is [too] interwoven with that of liability," attempting to retry only damages could lead to "confusion and uncertainty, which would amount to a denial of a fair trial." *Gasoline Prods.*, 283 U.S. at 500–01.

Here the damages issue cannot be separated from the merits of the liability claim. The jury found that HaynesTSA had "followed a pattern or practice of fraudulent conduct in submitting claims for payment under the price assistance program." Aplts. App. Vol. II at 684. But that finding does not distinguish among the four categories of erroneous claimbacks identified by Trane's expert: (1) quantity discrepancies; (2) sell-ups; (3) intracompany sales; and (4) inadequate documentation. HaynesTSA's counsel made distinct arguments to the jury regarding why the claimbacks in each category were not fraudulent. For

example, he contended that claimbacks lacking adequate documentation were the product of human error, not fraud. And sell-ups and intracompany sales, he said, were not fraudulent because Trane encouraged the former and openly permitted the latter.

The jury's "pattern or practice" verdict does not reveal whether it credited some of these arguments but not others. The jury could have rationally concluded that HaynesTSA followed a fraudulent practice with respect to sell-ups but that the other categories of claimback error did not rest on fraud. Or, alternatively, the jury could have found that claimbacks merely lacking adequate documentation were not the product of fraud, but that all other claimback errors were. In short, the general verdict in this case does not fix the scope of HaynesTSA's liability. A new jury could not calculate Trane's damages without resolving the specifics of that liability. *See Gasoline Prods.*, 283 U.S. at 499–500. Accordingly, Trane's entire fraud claim, and not simply the question of Trane's damages, must be retried.

### D.    Costs

The district court deemed Trane the prevailing party and assessed $145,460.01 in costs against Mr. Haynes and HaynesTSA. *See* Fed. R. Civ. P. 54(d)(1) (prevailing party generally entitled to costs). Because we vacate the verdict for Trane on its fraud claim against HaynesTSA, we must likewise reverse

-41-

the assessment of costs against HaynesTSA.  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1222 (10th Cir. 2003).

Mr. Haynes contends that costs may not be assessed against him because each of Trane's counterclaims against him failed.  We review the district court's award of costs for abuse of discretion.  *See Roberts v. Madigan*, 921 F.2d 1047, 1058 (10th Cir. 1990).  We see no abuse of discretion here.  True, Trane did not prevail on any of its counterclaims against Mr. Haynes.  But Mr. Haynes similarly failed on each of his claims against Trane.  A party need not prevail on every claim and counterclaim to be awarded costs as the prevailing party.  *See id.*  In a case like this in which all claims and counterclaims have failed, costs may be awarded to the counterclaimant if it "successfully fend[ed] off a large claim . . . despite failure to prevail on a [smaller] counterclaim."  *Scientific Holding Co., Ltd. v. Plessey Inc.*, 510 F.2d 15, 28 (2d Cir. 1974) (comparing damages sought and trial time spent on the claim and counterclaim); *see Roberts*, 921 F.2d at 1058 (when both parties prevail on some issues, "the district court's decision to award costs to the party that prevailed on the vast majority of issues and on the issues truly contested at trial [is] not an abuse of discretion").  Trane contends that its counterclaims against Mr. Haynes sought less in damages and were incidental to the much larger claims brought by Mr. Haynes.  Mr. Haynes has not responded to these contentions or provided a competing description of the claims and their comparative mass.  Because Mr. Haynes has given us no reason to doubt Trane's

characterization of the parties' claims, we find no abuse of discretion in deeming Trane a prevailing party vis-à-vis Mr. Haynes and awarding costs.

## III. CONCLUSION

We AFFIRM the district court's grant of judgment as a matter of law on Mr. Haynes's contract-modification claim and the fiduciary-duty claims of Mr. Haynes and HaynesTSA. We also AFFIRM the district court's decision to deny Mr. Haynes equitable-estoppel relief. But we REVERSE the district court's decision to appoint a special master for an accounting of Trane's fraud damages and REMAND for a new trial on Trane's fraud claim. Finally, we REVERSE the assessment of costs against HaynesTSA and AFFIRM the assessment of costs against Mr. Haynes.