FILED
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CGC HOLDING COMPANY, LLC, a
Colorado limited liability company;
HARLEM ALGONQUIN LLC, an Illinois
limited liability company; JAMES T.
MEDICK, on behalf of themselves and all
others similarly situated,

     Plaintiffs - Appellees,

v.

No. 18-1014

SANDY HUTCHENS, a/k/a Fred Hayes,
a/k/a Moishe Alexander, a/k/a Moshe Ben
Avraham; TANYA HUTCHENS;
JENNIFER HUTCHENS,

     Defendants - Appellants.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:11-CV-01012-RBJ-KLM)**
_____

Steven A. Klenda, Klenda Gessler & Blue LLC, for Defendants-Appellants.

Kevin P. Roddy, Wilentz, Goldman & Spitzer, P.A. (Scott R. Shepherd, Shepherd,
Finkelman, Miller & Shah, LLP, with him on the brief), for Plaintiffs-Appellees.
_____

Before **HARTZ**, **HOLMES**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

The story is a familiar one. Individuals and entities desperate for money came across nefarious characters who claimed to have money to lend. The money could be theirs if they paid handsome sums in the form of upfront, nonrefundable "loan commitment fees." But when the money never came and they realized that the lenders had never intended to fund their loans, the borrowers sued as a class against the lenders and their leaders. They sought relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68; and secured a collective jury verdict just shy of $8.5 million. After factoring in treble damages and pretrial settlements, the class obtained a final judgment exceeding $24 million.

Defendants Sandy Hutchens, Tanya Hutchens, and Jennifer Hutchens[1]—the three-member family who purportedly orchestrated the loan scam—now challenge certain of the district court's rulings in this years-long litigation to avoid paying all or part of the judgment against them. Almost all of those challenges fail, including their challenges to the jury's verdict, class certification, proximate causation, and the application of the equitable unclean hands defense.

Even so, we agree with the Hutchenses' position on the district court's imposition of a constructive trust on some real property allegedly bought with the swindled fees. We therefore affirm in part, reverse in part, and remand to the district court for entry of a revised judgment.

---

[1] We often refer to the individual members of the Hutchenses by their first names to more easily distinguish them.

2

I.

The class's version of events paints the Hutchenses as cunning con artists who puppeteered the advance-fee loan scam from afar. According to the class, Sandy Hutchens—the family's patriarch—was the scam's primary engineer. He claims that he began his career nearly forty years ago as a mortgage broker and has extensive experience facilitating loans between private lenders and hopeful borrowers.

But Sandy also had an extensive criminal history. The class presented evidence that Sandy's criminal record reflected convictions for theft, fraud, public mischief, forgery, and trafficking narcotics. Sandy's criminal record would have likely scared off potential borrowers from the outset. As the class rhetorically asked the jury at trial, "[w]hat rational person would pay hundreds of thousands of dollars in advance fees to someone with multiple criminal convictions for fraud and forgery?" Sandy thus hid his criminal past from borrowers. And the class argues that he did so by using various aliases, such as Moishe Alexander, Ben Avraham, and Frederick Merchant.

Sandy also did not have any money to lend. So the other part of the class's theory is that Sandy—generally working under his aliases—dramatically misrepresented how much money he had at his disposal. According to the class, Sandy and those working with him fabricated fake financial statements suggesting he and his companies had tens of millions of dollars to lend. The conspirators would then furnish those financial statements to borrowers upon request.

3

In any event, once Sandy had the scam in full swing, his "formula" for duping hopeful borrowers was not complicated. CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1082 (10th Cir. 2014).[2] First, Sandy created several different "issuing entities." The "issuing entities" served as the phony lenders. Sandy made five such entities over the years: (1) Canadian Funding Corporation, (2) 308 Elgin Street Inc., (3) First Central Mortgage Funding Inc., (4) Northern Capital Investment Ltd., and (5) Great Eastern Investment Fund LLC. All five entities shared two common traits: they had no money to lend, and they used fake business addresses while operating out of Sandy's home in Toronto.

Second, "a potential borrower would submit a loan application to one of [the five] issuing entities through a loan broker." Id. Canadian law forbids Canadian lenders from soliciting borrowers directly, so Sandy had to use intermediary brokers to keep up the issuing entities' appearances of legitimacy. Sometimes just one broker would serve as the conduit; sometimes several would. And no matter how many intermediary brokers participated in the chain of solicitation, a hopeful borrower would eventually encounter one of Sandy's issuing entities. Id.

Third, the issuing entity would extend a loan commitment agreement to the potential borrower. Id. At that point, the objective of the scam materialized because

---

[2] In that earlier appeal, we considered whether the district court properly certified the proposed class. CGC Holding Co., 773 F.3d at 1080–81. We answered in the affirmative. Id.

4

the loan commitment agreement required the borrower to pay, among other fees, "an up-front, non-refundable payment known as a 'loan commitment fee.'" Id.

Fourth and finally, the issuing entity would terminate the loan commitment agreement "for failing, in one form or another, to comply with the conditions of the agreement." Id. The class, of course, claims that Sandy had intended all along to terminate their agreements and never fulfill their loans. In their view, once Sandy had the borrowers' advance fees in hand, he had accomplished his only goal. Sandy ultimately walked away with over $8.4 million of the class's loan commitment fees after committing to over $3 billion in loans he could not fund.

But Sandy was not the only person in on the scheme. Sandy's wife Tanya and daughter Jennifer also purportedly played various roles. Jennifer, for instance, admitted that she had worked as a receptionist performing much of the clerical work for some of the issuing entities. She also admitted that she had posed as the "manager of underwriting" when corresponding with some borrowers to get more information from them.

Tanya's involvement was not as clear. Unlike Jennifer, Tanya denied participating in the scheme. But the class presented evidence that connected her to Sandy's plans. One of Sandy's ex-business partners, for instance, testified that he had worked with both Sandy and Tanya "nearly every day" for two-and-a-half years during the scam's infancy. And he also testified that Tanya's actions over that time—such as "typ[ing] up . . . loan commitments and letters of intent"—had led him to believe she had been "an equal partner in the business." Further, the class showed

5

the jury a letter from Sandy to his former attorney in which he referenced Tanya. In the letter, Sandy requested Tanya's appearance at a meeting about the "Internet presence" of one of the issuing entities—again suggesting that Tanya was involved in the scam.

Yet according to the class, Tanya's primary connection to the scheme was her receipt of "dirty money." The class maintained that Sandy, acting through the issuing entities, had funneled a lot of the swindled fees to Tanya. And receiving and benefitting from stolen money suggests participation in the scheme. In the class's view, that tended to show that Tanya had at least been a lower level participant in the scam. But taken in tandem with the other evidence of her involvement—the testimony of Sandy's ex-business partner and Sandy's letter to his attorney—Tanya's consistent receipt of the swindled fees confirmed that Tanya "was a continuing partner of Sandy's."

Whatever the case, Tanya ended up investing her share of the money in different Canadian properties. Those properties included Tanya and Sandy's house and twenty-three other locations scattered around greater Ontario. In fact, several other people ended up receiving a portion of the swindled fees from Sandy, including Sandy's own children, Tanya's mother, and other family members—and they also ended up investing in the same properties. And for that reason, the class contends that those properties constitute a large chunk of the borrowers' advance fees. Indeed, the class observes that the Hutchenses acquired *all* the properties after the borrowers had remitted their fees. And given that the Hutchenses were previously unable to

6

afford such a vast collection of real estate—as we mentioned above, Sandy artificially inflated his net worth to earn the trust of the borrowers—the class maintains that the only reasonable explanation is that they used the swindled fees to buy the properties. After all, the combined market value of the properties was over $16 million at one point, and neither discovery nor trial unearthed a legitimate source of funding that could have explained such hefty purchases.[3]

But the Hutchenses did not directly purchase most of those properties we describe above. Instead, they often executed the purchases through various companies. To be clear, those companies were not the five issuing entities but rather unrelated entities that the Hutchenses had created to purchase and hold the properties. So, strictly speaking, these entities, not the Hutchenses, owned many of the properties.

But even as the Hutchenses sought to protect their ill-gotten gains, the borrowers started getting suspicious. So the borrowers joined as a class and sued in Colorado federal court to retrieve their advance fees. At first, the class asserted multiple claims against multiple parties. But after years of litigation, only the class's two RICO claims against the Hutchenses remained on the eve of trial.

The class ultimately prevailed at trial, but despite its victory, it still faced the uphill battle of collecting its judgment from the Hutchenses. So, as a remedy, the

---

[3] At trial, Tanya testified "that she bought the properties with her own funds." But the district court "did not find [that] testimony to be credible."

district court imposed a constructive trust on the properties and entities described above.

The Hutchenses now appeal, raising several issues, including challenges to personal jurisdiction, sufficiency of the evidence, causation, class certification, and remedies. To that end, they begin by trying to protect Tanya. As to Tanya, the Hutchenses first challenge personal jurisdiction, followed by challenges to the jury's RICO verdict against her, including the availability of class-wide liability. After concluding their arguments about Tanya, the Hutchenses turn to the statutory requirements under RICO, challenging whether the class satisfied RICO's distinctness and proximate causation requirements. The Hutchenses follow with argument regarding the equitable defense of unclean hands—primarily, whether it defeats the class's RICO claims. Finally, the Hutchenses challenge the district court's imposition of a constructive trust.

We address each in turn.

## II.

The Hutchenses first contend that because Tanya had no minimum contacts with the United States, the district court lacked personal jurisdiction over her. We review the exercise of personal jurisdiction over a foreign defendant de novo. Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1166 (10th Cir. 2011).

When a plaintiff's claims arise under federal law and the defendant is not subject to the jurisdiction of any state court of general jurisdiction, Federal Rule of Civil Procedure 4(k)(2) provides for federal long-arm jurisdiction if the plaintiff can

8

show that the exercise of jurisdiction comports with due process. Compania de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V., ___ F.3d ___, ___ n.1 (10th Cir. 2020) (discussing GCIU-Employer Ret. Fund v. Coleridge Fine Arts, 700 F. App'x 865, 867–68 (10th Cir. 2017) (unpublished)). Tanya admits that the class's claims arise under federal law. She likewise contends she is not subject to personal jurisdiction in Colorado, so Rule 4(k)(2) applies in this case. When a "defendant contends that he cannot be sued in the forum [state] and refuses to identify any other [forum state] where suit is possible, then the federal court is entitled to use Rule 4(k)(2)," so long as the exercise of federal jurisdiction satisfies Fifth Amendment due process standards.[4] Compania de Inversiones Mercantiles, ___ F.3d at ___ (quoting ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)).

To determine whether the exercise of federal jurisdiction over Tanya satisfies due process, we must determine whether Tanya had minimum contacts with the United States. The minimum contacts standard allows a federal court to exercise specific personal jurisdiction over a foreign defendant only if the defendant purposely directed her activities at the forum and the plaintiff's injuries arose from the defendant's forum-related activities. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008).

---

[4] The parties do not argue that any meaningful distinction exists between the Fifth and Fourteenth Amendment due process standards.

Here, the Hutchenses directed the activities involving their RICO conspiracy at the United States. Although Tanya's involvement in the scheme was not as clear cut, the class presented evidence that she was an integral player. The class presented evidence that Tanya and her husband had conducted the scheme from their home office in Toronto and that Tanya had participated in the scheme by preparing loan commitment letters directed at U.S. borrowers. Moreover, Tanya received into her accounts the net proceeds of the advance fees. Further, the class presented evidence from one of Sandy's ex-business partners Martin Lapedus, who testified that he had worked with both Sandy and Tanya "nearly every day" for two-and-a-half years during the scam's infancy. And he also testified that Tanya's actions over that time—such as "typ[ing] up . . . loan commitments and letters of intent"—had led him to believe that she had been "an equal partner in the business." The class also showed the jury a letter from Sandy to his former attorney that referenced Tanya. In the letter, which Sandy wrote during the scam's heyday, Sandy requested Tanya's presence at a meeting about the "Internet presence" of one of the issuing entities— again showing that Tanya was in on the scam.

The class also maintained that Sandy, acting through the issuing entities, had funneled a large portion of the swindled fees to Tanya. And receiving and benefitting from stolen money—or as the class put it, "sucking the money out of" a fraudulent scheme—tended to show that Tanya had been a participant in the scam. When combined with the other evidence of her involvement—the testimony of Sandy's ex-business partner and Sandy's letter to his attorney—Tanya's receipt of

the swindled fees over the years showed that she directly participated in and benefited from the scheme.

We are not saying that Tanya had minimum contacts with the United States because of Sandy's contacts. Instead, she had minimum contacts with the United States because her own actions—as a participant in the conspiracy—were directed at the United States and its citizens. Further, the class's claims, and their accompanying injuries, arose because of the Hutchenses' advance-fee loan scheme. We therefore conclude that the class's injuries arose out of Tanya's forum-related activities, as a co-conspirator in the scheme.

The next issue we must address is whether the exercise of jurisdiction was reasonable. "Even when a defendant has purposely established minimum contacts with a forum state, 'minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction.'" TH Agric. & Nutrition, LLC v. Ace European Group Ltd., 488 F.3d 1282, 1292 (10th Cir. 2007) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477–78 (1985)). We consider: (1) "the burden on the defendant," (2) "the forum state's interest in resolving the dispute," (3) "the plaintiff's interest in receiving convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several states in furthering fundamental substantive social policies." OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1095 (10th Cir. 1998). A defendant must present

a "compelling" case that these factors render jurisdiction unreasonable. Compania de Inversiones Mercantiles, ___ F.3d at ___ (citing Burger King, 471 U.S. at 477).

In challenging jurisdiction, Tanya claims no evidence exists that she had any contacts with the United States, an argument we reject above. Tanya fails to argue, let alone alert us to any facts, on the reasonableness of jurisdiction. Nor does she address any of the above-listed factors. Given that a defendant "must present a compelling case" that exercising jurisdiction was unreasonable, Tanya's failure to address or argue the issue seals her fate. Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). The class presented sufficient evidence of minimum contacts with the United States through her role as a player in the advance-fee loan scheme.[5] We conclude that the exercise of personal jurisdiction over Tanya satisfied due process.

III.

The Hutchenses next claim that no evidence supports the jury's RICO verdict against Tanya. We review sufficiency of the evidence claims de novo. Johnson v. Unified Gov't of Wyandotte Cnty./Kansas City, 371 F.3d 723, 728 (10th Cir. 2004) ("We review the denial of a motion for judgment as a matter of law based on the ground of insufficiency of the evidence de novo, using the same legal standard as the district court.").

---

[5] Tanya was the only defendant who appeared at trial.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In sum, a violation of § 1962(c) consists of: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. And § 1962(d) prohibits a person from conspiring to violate § 1962(c).

The word racketeering tends to evoke images of mobsters and organized criminals, and true enough, RICO—at least initially—"was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498 (1985); see also id. at 526 (Powell, J., dissenting) (observing that "mobsters . . . were the clearly intended target of" RICO). But the plain language of RICO defines racketeering far more broadly in a way that allows the statute to "reach both legitimate and illegitimate" businesses. Id. at 499 (internal quotation marks omitted). Indeed, among many other qualifying acts, RICO defines a racketeering activity as "any act which is indictable under" the federal statute outlawing wire fraud—a crime that any modern business could commit. 18 U.S.C. § 1961(1)(B); see also 18 U.S.C. § 1343 (outlawing wire fraud).

The class pursued RICO claims based on the theory that the Hutchenses had engaged in wire fraud by using "wire transfers, e-mail, telephone, Internet, and facsimiles" to defraud the class members of their advance fees. As they reasoned, RICO allowed the class to get their fees back because the statute allows any person

13

injured "by reason of" a RICO violation to bring a civil suit in federal court and "recover threefold the damages" against the responsible parties. 18 U.S.C. § 1964(c).

But proving a RICO violation requires more than racketeering activity alone. For one thing, the class also had to establish a *pattern* of racketeering activity, which RICO defines as "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5); see also 18 U.S.C. § 1962 (requiring "a pattern of racketeering activity" for every type of RICO violation). Further, under 18 U.S.C. § 1962(c)—the subsection giving rise to the class's first RICO claim—the class had to show that the Hutchenses "conduct[ed]" an "enterprise" *through* that pattern of racketeering activity. 18 U.S.C. § 1962(c). And finally, if the class hoped to prevail under 18 U.S.C. § 1962(d)—the subsection supporting the class's second RICO claim—they had to show that the Hutchenses "*conspire[d]* to violate" RICO in some way. 18 U.S.C. § 1962(d) (emphasis added).

The Hutchenses claim that the class presented no evidence that Tanya violated § 1962(c) and § 1962(d). We disagree for several reasons. The class presented evidence that the Hutchenses—including Sandy, Jennifer, and Tanya—agreed to a scheme in which some conspirators would commit predicate acts (wire fraud) and others would provide support. So even though Tanya's involvement was not as clear cut, as discussed above, the class's evidence showed that Tanya had participated in the operation or management of the enterprise in a supporting role and sufficiently connected her to Sandy's plans. "A conspiratorial agreement . . . need not be express so long as its existence can plausibly be inferred from the defendant['s] words and

14

actions and the interdependence of activities and persons involved." United States v. Smith, 413 F.3d 1253, 1273 (10th Cir. 2005) (alteration in original and citation omitted) overruled on other grounds by Boyle v. United States, 556 U.S. 938, 948–49 (2009). Here, a plausible inference exists that Tanya participated in the conspiratorial agreement based on the testimony of Sandy's ex-business partner about Tanya's role, as well as Sandy's correspondence regarding Tanya's presence at a meeting about an entity's "Internet presence."

The class also presented evidence that Tanya had knowingly received money generated by the co-conspirators' activities because Sandy and the issuing entities directed the lion's share of the swindled fees directly to her. Thus, the class showed that Tanya not only drafted loan commitments and letters of intent in the early days of the scheme, but she also repeatedly received the fruits of the enterprise over the years. The class's evidence apparently led the jury to believe that Tanya had conspired to violate § 1962(c). Moreover, just because Tanya played a supporting role does not relieve her of responsibility for her involvement in the scam. Salinas v. United States, 522 U.S. 52, 64 (1997). "[S]upporters are as guilty as the perpetrators." Id. After reviewing the evidence, we conclude that the class presented sufficient evidence to sustain the jury's RICO verdict against Tanya.[6]

---

[6] The Hutchenses make two more arguments regarding class-wide liability and the class period. First, they argue that the class failed to present sufficient evidence to support class-wide liability against Tanya. Again, we disagree. The class presented sufficient evidence of Tanya's involvement as a co-conspirator in the advance-fee loan scheme. And we upheld the district court's class certification, concluding that the borrowers had demonstrated commonality and predominance, as

15

IV.

The Hutchenses next argue that the class failed to satisfy RICO's distinctness and proximate causation requirements. They also claim the district court adopted an unknown comparative-fault concept of the unclean hands doctrine and precluded them from asserting the doctrine as a defense at trial. Consequently, the Hutchenses claim the district court erred in denying their motions for summary judgment and judgment as a matter of law on these issues. We review these claims de novo.[7] Johnson, 371 F.3d at 728; Applied Genetics Intern., Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); Haberman v. Hartford Ins. Grp., 443 F.3d 1257, 1264 (10th Cir. 2006).

A.

Before the district court, the class alleged that the issuing entities were Sandy's alter ego and asked the district court to disregard their corporate form. The Hutchenses claim that these alter-ego allegations destroyed the person/enterprise distinction that RICO requires. Section 1962(c) requires a plaintiff to prove the

_____

required by Rule 23. CGC Holding Co., LLC, 773 F.3d at 1085–99. Second, the Hutchenses argue that the district court abused its discretion in not amending the class period. But they fail to cite any adequate basis for their argument, let alone relevant case law, showing how the district court abused its discretion. Bronson, 500 F.3d at 1104 (stating that we routinely "decline[] to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief"). As a result, we reject the Hutchenses' arguments challenging class-wide liability and the class period.

[7] Though neither party briefed the proper standard of review, we ordinarily review application of the unclean hands doctrine for abuse of discretion. Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc., 573 F.3d 947, 957 (10th Cir. 2009). But we review de novo the legal determinations underlying the court's decision. Id.

16

existence of two distinct entities: a "person" and an "enterprise." Cedric Kushner

Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). The Hutchenses argue that

because the class also claimed that the issuing entities were Sandy's alter ego, those

entities were not distinct or separate from Sandy himself. And without the existence

of a separate "person" and "enterprise," the class cannot prevail on their RICO

claims.

We reject the Hutchenses' argument as contrary to RICO's basic purpose. The

Supreme Court has stated that RICO "protects the public from those who would

unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle'

through which 'unlawful . . . activity is committed.'" Id. at 164 (quoting Nat'l Org.

for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994)). And the Court has

acknowledged that the "corporate owner/employee, a natural person, is distinct from

the corporation itself, a legally different entity with different rights and

responsibilities due to its different legal status." Id. at 158. Thus, RICO "requires no

more than the formal legal distinction between 'person' and 'enterprise' (namely,

incorporation)," which is present here. Id. at 165.

The issuing entities included CFC (formed in 2004), 308 Elgin (formed in

2006), FCMF (formed in 2006), Northern Capital (formed in 2010), and GEIF

(formed in 2011). Each issuing entity was distinct—i.e., a corporation with its own

legal existence. We find "nothing in RICO that requires more 'separateness' than

that." Id. at 158 ("[L]inguistically speaking, the employee and the corporation are

different 'persons'" because "[i]ncorporation's basic purpose is to create a legal

17

entity distinct from those natural individuals who created the corporation, who own, or whom it employs." (Id. at 159)). The Hutchenses' position would allow an individual—like Sandy—to avoid RICO liability by using shell companies to conduct criminal enterprises. And while using shell companies as shams to perpetuate frauds might eliminate any separateness between the wrongdoer and his shell corporation in the business corporations context (i.e., through veil piercing), it does not destroy the separateness that RICO requires. Such a position would undermine RICO's purpose of protecting "the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate)" to commit unlawful activity. Id. at 164. We thus reject the Hutchenses' argument that the class's alter-ego allegations destroyed any separateness between Sandy and the issuing entities under RICO.[8]

## B.

The Hutchenses next challenge causation. RICO requires that a plaintiff prove both but-for and proximate causation. CGC Holding Co., LLC, 773 F.3d at 1088. The Hutchenses contend the class failed to prove proximate causation. The Supreme Court has held that when a court evaluates a RICO claim for proximation causation, we must ask "whether the alleged violation led directly to the plaintiff's injuries." Id. (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)). The

---

[8] The D.C. Circuit rejected a similar argument in United States v. Philip Morris USA, Inc., 566 F.3d 1095 (D.C. Cir. 2009). There, the D.C. Circuit stated that Cedric Kushner held that "an individual sole shareholder," like Sandy, "is sufficiently distinct from his alter-ego corporation[s] to sustain RICO liability." Id. at 1113.

18

Hutchenses argue that the loan applicants (members of the class) would not have qualified for the loans because legitimate reasons existed to decline to fund each of the loans. And the class members were aware that their advance fees were non-refundable should they not qualify. Thus, because the loan applicants would have lost their fees regardless of the alleged RICO violation, the Hutchenses argue that the class cannot show the alleged RICO violation directly led to their injuries.

The Hutchenses' argument misses the mark. The operative question is whether the class members would have applied for the loans in the first place had they known Sandy was a career criminal and that the issuing entities could not fund the loan commitments. If the Hutchenses had not made these misrepresentations, we can conclude that the class members would not have applied for the loans and would not have lost any of their fees. Id. at 1081.[9]

With this in mind, we decline the Hutchenses' invitation to reframe the relevant question. The Hutchenses fraudulently induced the class members to enter into loan commitments. And so the class members paid advance fees on loans that the Hutchenses would not and could not fund. As we stated in our prior opinion upholding class certification in this case, "no rational economic actor" would have

---

[9] We previously upheld class certification because class members could establish causation based on the theory that "no rational economic actor would enter into a loan commitment agreement with a party they knew could not or would not fund the loans." CGC Holding Co., LLC, 773 F.3d at 1081. We also held that the class's "payment of up-front fees allows for a reasonable inference that the class members relied on lenders' promises, which later turned out to be misrepresentations." Id.

19

entered into such a loan commitment agreement. Id. Accordingly, the Hutchenses'

misrepresentations directly caused the class to suffer monetary damages.

C.

The Hutchenses also allege that the district court precluded them from

asserting the equitable defense of unclean hands by applying an unknown

comparative-fault concept. The district court held it would be "inequitable, indeed an

undeserved windfall, to permit defendants' success at identifying the described

omissions in five applications to be sufficient to negate liability for massive fraud."

The district court judge, however, stated he would not "close [his] mind to the

possibility that evidence might support intentional misrepresentation by a particular

applicant that rises to the point that an unclean hands defense can be asserted against

that applicant."

The unclean hands doctrine means, in general, that equity will not aid a party

whose conduct has been unlawful, unconscionable, or inequitable.[10] Houston Oilers,

Inc. v. Neely, 361 F.2d 36, 42 (10th Cir. 1966). But the doctrine "does not exclude

all wrongdoers from a court of equity nor should it be applied in every case where the

conduct of a party may be considered unconscionable or inequitable." Id. And

district courts have discretion in deciding whether to apply the unclean hands

doctrine. Id.; see also Haynes Trane Serv. Agency, Inc., 573 F.3d at 957.

---

[10] The class argues that the unclean hands defense should not apply in a civil RICO case. We decline to take up the issue today because even if the unclean hands doctrine applies in this context, the district court did not abuse its discretion in refusing to apply it.

Here, the district court did not abuse its discretion in refusing to apply the unclean hands doctrine. The district court considered the Hutchenses' evidence and determined that they had failed to show that any class member intentionally or knowingly omitted or misrepresented material information in his or her loan application. The district court also concluded that the Hutchenses did not show that any alleged fraud so affected the balance of equities that it warranted dismissal of a class action involving more than 100 defrauded loan applicants.

Ultimately, the Hutchenses identify no evidence convincing us that the district court abused its discretion in not applying the equitable defense of unclean hands. Besides their failure to identify any evidence showing class members intentionally or knowingly misrepresented the information on their applications, the Hutchenses fail to address how the unclean hands doctrine can apply when the purported misrepresentations did not influence the Hutchenses' behavior. In the end, no matter if the applications were one hundred percent true or full of lies, the Hutchenses never intended to (and in fact could not) fund the loans. In this context, we have no trouble concluding the district court properly exercised its discretion when it refused to apply the unclean hands doctrine.

V.

The Hutchenses finally challenge the district court's imposition of a constructive trust on many tracts of real property. "A constructive trust is an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant."

21

Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1451 (10th Cir. 1996) (citation omitted). Although they raise several different arguments, we ultimately need consider only two.

A.

The Hutchenses first argue that a court cannot attach a constructive trust to property that a nonparty legally owns without allowing the nonparty to defend itself. Thus, because nonparties own most of the real estate that is subject to the constructive trust, and also because those nonparties could not speak out against the constructive trust, the Hutchenses maintain that the district court abused its discretion by attaching that equitable remedy to the nonparties' real estate. See United States v. Andrews, 530 F.3d 1232, 1238 (10th Cir. 2008) ("Because imposition of a constructive trust is an equitable remedy, we review the district court's decision for abuse of discretion."). We agree.

In addressing whether the district court properly imposed a constructive trust, we rely on Colorado state law given the location of the federal forum in which this case originated.[11] See Foster v. Kinzler (In re Foster), 275 F.3d 924, 926 (10th Cir. 2001) (observing that we "look to state law to determine whether a party has met [its] burden" of establishing a constructive trust); see also id. (applying Colorado state law when the case arose in Colorado federal court). And under Colorado law, a constructive trust is an "*in personam* order that requires . . . the constructive

---

[11] In their briefing on this issue, both parties rely on Colorado state law and neither party argues that the law of another jurisdiction controls.

22

trustee . . . to transfer specific property in some form to . . . the beneficiary of the trust." In re Marriage of Allen, 724 P.2d 651, 657 (Colo. 1986) (emphasis in original). But the monikers "constructive trustee" and "beneficiary of the [constructive] trust" are a bit misleading. Id. Indeed, "in the modern law of constructive trust there is no requirement that the parties have ever occupied a fiduciary or confidential relation[ship]" that actual trusts require. Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. B (2011). Still, we continue to use the trust metaphor because "the central feature of the [constructive trust] remedy" is "the determination by the court that B's legal title to particular property must yield to A's superior (and equitable) right of ownership." Id.

But for our purposes today, the striking part of a constructive trust under Colorado law involves its nature as an in personam order. In Latin, "in personam" means "against a person." *In personam*, Black's Law Dictionary (11th ed. 2019). An in personam order, therefore, means an order that binds "a person rather than property." United States v. Jantran, Inc., 782 F.3d 1177, 1180 n.2 (10th Cir. 2015) (quoting *In personam*, Black's Law Dictionary (9th ed. 2009)). And as applied to this case, that means the constructive trust does not bind the real estate itself; instead, it binds the owners of the real estate.

Yet as we described above, most of the owners of the real estate are nonparties. As the Supreme Court has made clear, "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has

23

not been made a party by service of process." Hansberry v. Lee, 311 U.S. 32, 40 (1940); see also Taylor v. Sturgell, 553 U.S. 880, 892–93 (2008) (quoting Richards v. Jefferson Cnty., 517 U.S. 793, 798 (1996)) ("deep-rooted historic tradition" of due process requires, at the bare minimum, "that everyone should have his own day in court" and a nonparty "generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in" the lawsuit). So because the entities that own the real estate are nonparties, and because the district court's order imposing a constructive trust was an in personam order against them, the constructive trust presumptively does not bind them.

The district court believed that it had the authority to attach the constructive trust to the real properties at issue "regardless of the title to the properties" because, in its view, "the very function of a constructive trust is to pierce the 'legal' façade to do equity under the circumstances." In other words, the district court apparently believed that a constructive trust can bind *anybody* who holds title to property so long as the property rightly belongs to the person asking for the constructive trust.

Although we agree that a constructive trust is a flexible remedy that a district court may employ when justice so requires, that does not mean that a court can automatically use a constructive trust to pierce the legal façade of a *nonparty* title holder. In most cases, subject to some limited exceptions, that would extend the principle too far. A constructive trust is not an all-powerful tool; it is a remedy like any other that is subject to the traditional tenets of in personam orders. Thus, courts

24

normally impose constructive trusts against parties in the litigation. The district court thus erred in concluding otherwise.[12]

Because the district court misapplied the constructive trust remedy, we think the most appropriate course is to remand this case to the district court for further proceedings. As noted above, some limited exceptions permit constructive trusts to bind nonparties. For example, the Supreme Court has said that courts may bind nonparties when they have a "substantive legal relationship" with an actual party to the suit, such as the relationship between "preceding and succeeding owners of property." Taylor, 553 U.S. at 894. In a similar vein, the Supreme Court has observed that courts may bind nonparties when they are "adequately represented by someone with the same interests who [is] a party." Id. (quoting D. Shapiro, Civil Procedure: Preclusion in Civil Actions 78 (2001) and Richards, 517 U.S. at 798). Further, Colorado law recognizes "reverse piercing of the corporate veil," which "occurs when a [plaintiff] seeks to disregard the separate existence of a corporation and obtain the assets of the entity due to the actions of a dominant shareholder or other corporate insider. In re Phillips, 139 P.3d 639, 641 (Colo. 2006).

Given these potential exceptions, the district court can decide in the first instance whether these exceptions (or any others) do apply. This will allow the

---

[12] On a related note, the fact that "a constructive trust can be imposed on a third party into whose possession the property or its proceeds can be traced" does not change our analysis. In re Marriage of Allen, 724 P.2d at 657. "Third party" does not necessarily mean "nonparty."

district court—the undisputed expert in the case who has overseen it for nearly a decade—to pass judgment on the matter first because we are a court of review, not first view. We therefore vacate the district court's order imposing a constructive trust to the extent that the trust binds any nonparties to this case, and we remand to the district court for proceedings consistent with this framework.

B.

With all of that said, not all the owners of the real estate at issue are nonparties. By our count, Tanya—either legitimately or through one of her own aliases—owns three of the properties to which the district court attached the constructive trust. Those properties apparently include one parcel of land at 1779 Cross Street in Innisfil, Ontario, and two parcels of land at 33 Theodore Place in Vaughan, Ontario. We conclude that the district court abused its discretion by failing to sufficiently trace the class's swindled fees to those specific real properties.

Although tracing in this case was (and is) a complicated endeavor, the district court's tracing analysis fell short of the required mark. The district court simply did not provide *enough* analysis to satisfy us that attaching a constructive trust to these three properties was not arbitrary. See Burke v. Regalado, 935 F.3d 960, 1011 (10th Cir. 2019) ("A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." (citation omitted)). Indeed, the district court effectively asked us to trust it because "[i]t appears" the swindled fees are traceable to those properties.

26

We need more analysis to conduct meaningful appellate review. To that end, we vacate the district court's order attaching a constructive trust to the real estate that Tanya owns. And we remand to the district court with instructions to conduct a tracing analysis that explains in detail why a constructive trust should attach to each of Tanya's three properties in the specific amounts that the district court previously identified (or, if the amounts differ from before, why that difference is justified).[13]

## VI.

In sum, we VACATE the district court's order imposing a constructive trust to the extent that the trust binds any nonparties to the case, and we remand to the district court for proceedings consistent with section V(A). We also VACATE the district court's order attaching a constructive trust to the real estate that Tanya owns (which is apparently one parcel of land at 1779 Cross Street in Innisfil, Ontario, and two parcels of land at 33 Theodore Place in Vaughan, Ontario) and remand with instructions to conduct a thorough tracing analysis. In all other aspects, we AFFIRM.

---

[13] Of course, if the district court determines on remand that a constructive trust should continue to bind the nonparty entities, it should likewise make sure to conduct an equally in-depth tracing analysis as to those entities' real properties.